[Civ. No. 47313. Second Dist., Div. Three. May 26, 1976.]

LOMPOC FEDERATION OF TEACHERS,
LOCAL 3151, AFT, AFL-CIO, Plaintiff and Appellant, v.
LOMPOC UNIFIED SCHOOL DISTRICT et al.,
Defendants and Respondents.

702

## Counsel

Van Bourg, Allen, Weinberg, Williams & Roger, Van Bourg, Allen, Weinberg & Roger and Stewart Weinberg for Plaintiff and Appellant.

George P. Kading, County Counsel, and Dana D. Smith, Assistant County Counsel, for Defendants and Respondents.

## Opinion

POTTER, J.—Petitioner Lompoc Federation of Teachers, Local 3151, AFT, AFL-CIO (hereinafter "petitioner") appeals from a judgment denying its petition for writ of mandate. The petition sought a writ directing respondents Lompoc Unified School District and Governing Board of the Lompoc Unified School District (hereinafter "District" and "Board") to pay teachers in grades 4, 5 and 6 (hereinafter "intermediate teachers") an additional 1/6 of their salary, by virtue of the fact they are regularly required to spend 325 minutes per day in classroom instruction, whereas teachers in grades 1 through 3 (hereinafter "primary teachers") and teachers in grades 7 through 12 (hereinafter "secondary teachers") are required to spend only a total of 280 minutes per day in classroom instruction for the same salary.

At the trial the court received in evidence the District's various rules, regulations and policy memoranda covering the salary schedule for certificated personnel, the length of the school day and teachers' hours of service, and the daily schedules of class activities for primary and intermediate grades. Oral testimony of four witnesses was received. Declarations of three of these witnesses were also received pursuant to stipulation that the witness be deemed to have so testified.

Most of the operative facts were not in dispute. The regular salary of all teachers in respondent District with equal academic training and experience was the same, regardless of the grade level taught. The working day for all teachers was the same; that is, all teachers were required to be present at school for approximately the same period of time.[1]

However, the hours of class instruction were different for the three categories of teachers. This came about as the result of the length of school day established for the various grade levels by the District. The school day is the time during which students are in attendance in class.[2] Under the regulations of respondent Board, the school day for primary grades was set at 280 minutes, for the intermediate grades at 325 minutes, and for the secondary grades at 280 minutes. As a result, the intermediate teachers, though not required to be present at school for a longer period, were called upon to devote a greater portion of the time they were required to be at school to classroom instruction.

Further undisputed facts related to the practice of respondent Board, during the 9-year period immediately prior to trial, of permitting certain secondary teachers to receive 1/6 additional compensation by teaching an additional 45-minute period. In the secondary schools in respondent District, the school day was divided into 7 instructional periods of 45 minutes each. The secondary teachers normally taught six out of the seven periods and had one "free" period available for classroom preparation and conferences with parents and students. Under special circumstances, certain teachers were requested by respondent

[1]The District regulation required all teachers to be present from one-half hour before classes commenced until one-half hour after classes closed. However, if classes closed prior to 3 p.m., the teachers were required to remain until 3:30 p.m.

[2]See Education Code, section 11006.5, providing for alternative computation of the minimum school day for elementary grades which refers to "minutes of attendance."

Board to undertake a seventh class and forego the preparation period. These circumstances were that certain elective courses in the area of the industrial arts, such as photography and wood shop, were taught by a single teacher in most of the secondary schools. When more students elected the course than could be accommodated in six periods, respondent Board from time to time asked the teacher to teach an additional class and be compensated for it. It was difficult to employ a teacher to teach the additional one period per day, and the alternative was to deny the students the opportunity to take the elective class. During the 9-year period, there was an average of 1.2 teachers being so compensated in the entire district.[3] The record does not disclose the total number of secondary teachers in the District. There is evidence, however, from which it may be inferred that there were approximately 80 such teachers.

The remaining evidence bore upon the respective parties' contentions regarding the reasonableness of the District's establishment of shorter normal periods of classroom instruction for primary and secondary teachers in comparison to intermediate teachers. John McCoy, an intermediate teacher called as a witness by petitioner, testified that in addition to the time consumed in classroom teaching, intermediate grade teachers engaged in daily class preparation at school after the school day ended or at home. McCoy also described extracurricular activity done by intermediate teachers on a voluntary basis, including acting as student council sponsor, intramural sports supervision and club activities. He did not, however, engage in any such activities during the school year 1975-1976. McCoy also described intermediate teachers' preparation in conferences with parents, in part during two one-week periods per year when reduced class schedules were in effect and when the need occurred at other times, before school, during recess, lunch periods or after school. McCoy also described the assigned supervisory duties of intermediate school teachers; though normally supervision of the students during recess and lunch periods for both primary and intermediate students was handled by teachers' aides, each teacher performed four weeks per year recess supervision and four weeks per year supervision for the 15 minutes before class began. In addition, on rainy days when recess and lunch periods were spent in the classrooms, the primary and intermediate teachers performed supervision. However, on the days when the

---

[3]During the nine years in question, the number of teachers with seven periods varied from three to zero, as follows: three in one year; two in each of three years; one in one year; one for one semester only in one year; none in each of three years.

primary and intermediate teachers were required to supervise during recess or lunch, they were permitted to leave the school at 3 p.m. McCoy described past experience as a secondary teacher in which he taught six classes with two different subject matters and stated that in his present employment as intermediate teacher he had eight subjects to prepare on a daily basis. Comparing the preparation required for primary teachers with that required of secondary teachers, McCoy stated that he "would not think" that they needed more time to prepare, that he knew of no study within the District showing the length of time required in preparation for the various grade levels. He also pointed out that the subject matter for grades 4 through 6 was more difficult and complex than the subject matter of the primary grades. McCoy acknowledged the use of commercially prepared lesson materials in the intermediate grades. He was unable, however, to compare the volume of such material available for primary grades.

Witnesses in behalf of respondent District included Alice Milligan, assistant superintendent in charge of personnel; Robert Mott, principal of Lompoc Junior High School; and Don Hart, principal of West Wings Elementary School, both schools being a part of the District.

Milligan testified that she was familiar with the duties and duty hours of teachers within the District. She explained that the one-hour "free" periods were for secondary teachers to prepare for their daily class work and for conferences with students in light of the fact that such teachers were required to spend more time outside the classroom in extracurricular activities and in supervision than is required of primary and intermediate teachers. She described the supervision duties as including lunch hour supervision on a rotation basis by all secondary teachers.

On cross-examination, Milligan testified that certain extracurricular activities, referred to in the salary schedule as "Co-Curricular Assignments," resulted in an additional $350 per year pay.[4] Other than for the four specific assignments, no additional stipend was payable. Milligan referred to the nonpaid extracurricular activities of secondary teachers, of which there are at least 50 for students in grades 7 through 12, as being

---

[1]There were four such assignments shown in the regulations. They were "Senior High Drama Coach," "Senior High Forensics Coach," "Senior High Choral Director," and "Senior High Year Book Advisor." With respect to the forensics coach, Milligan stated: "[I]t is not uncommon for a teacher responsible for forensics to spend up to 500 hours per year working with students."

the subject of subdivision IV (A) of the rules and regulations of the teachers' salary schedule which provides: "A reasonable amount of extracurricular activities, and other types of work done outside of school is considered part of the normal load of the instructor." Traditionally, extracurricular activities existed only in the secondary level; primary and intermediate teachers were not required to supervise extracurricular activities. She stated, however, that "at the secondary level, we do require that teachers supervise extracurricular activities." Though direct assignments had not been made, the teachers were asked to sign up "for their areas of interest," and "those that don't sign it, will be assigned."

Milligan also testified that the District considers that a primary teacher "requires more preparation time than a teacher in four through six," because of the age level of the children and the extra amount of "parent conferencing involved."

The witness Mott testified to the approximate hours per school year required for extracurricular duties of a secondary teacher. He computed a total of 8,041 hours of student contact and preparation which was approximately 100 hours per school year for each teacher. Though this was not equally divided among the teachers, an effort was made to see that teachers "generally do equal service" by pointing out to those who were not carrying their share that "someone else is picking it up for them." These extracurricular duties for secondary teachers' greatly exceed those required of primary and intermediate teachers because "[t]he total events and functions at the secondary program . . . would far exceed any such events at the elementary."

Mott also gave further specifics concerning the assigned supervision duty of secondary teachers. This comprised two components at the junior high schools; lunch hour supervision amounting to 15 to 20 minutes per day was assigned for 90 to 115 days. At the high schools there were assigned 20 days of one-half hour per day lunch hour supervision. In addition, all secondary teachers were responsible for 35 minutes per day supervision of students during "passing times," adding a total of 102 hours of supervision duty.

The witness Don Hart testified that despite the shorter primary school day, primary teachers spend more time at school than intermediate teachers—something on the order of one-half hour per day. According to Hart, more time outside of class is required for lesson preparation in the

primary grades than is required in the secondary grades. Factors contributing to this include lesser availability of commercially prepared lesson material for primary instruction. These kits which are used extensively in intermediate grades enable students to work independently without teacher direction, whereas primary students, many of whom cannot read, require constant teacher direction. The prepared materials eliminate the necessity "to create the problems," and "devise your own key," because "grade keys are already set up for you." The declaration of Don Hart also pointed out that primary teachers were required to spend more time outside of classes in conferences with parents than is necessary for intermediate teachers.

At the conclusion of the evidence briefs were filed by the parties. Thereafter the court issued its memorandum of intended decision denying the writ. Findings of fact and conclusions were requested by petitioner. Proposed findings were submitted by both parties. The court adopted some of the findings proposed by each of the parties. The significant findings of the court were as follows:

"4. That within the Lompoc Unified School District, teachers of the First, Second and Third Grades, and of Grades Seventh through Twelfth are required to spend a total of 280 minutes per day in classroom instruction, but teachers of Grades Fourth, Fifth and Sixth are required to spend a total of 325 minutes in classroom instruction.

"5. No extra compensation is paid to teachers of Fourth, Fifth and Sixth Grades by reason of the additional time they must spend per day in classroom instruction.

"6. High school level teachers have what has been called a 'free period' during each day. If they have classroom instruction during this period, they receive extra compensation in the amount of 1/6 of their regular salary therefor. There are few instances of such teaching during 'free periods' in the past.

"7. Teachers of Grades Seventh through Twelfth have a substantial amount of activities and duties outside of regular classroom hours, which although not expressly mandated by the Governing Board of the District are nevertheless strongly suggested by Board policy. Their duties involve substantially more than classroom instruction, and teachers of Grades Fourth, Fifth and Sixth do not have so much extracurricular duties.

"8. Teachers of Grades First, Second and Third must devote more time to lesson planning, motivation of individual children, and conferences with parents than teachers of Grades Fourth, Fifth and Sixth, whose students require less individual instruction and for whom it appears more commercial lesson preparation material is available."

From these findings, the court concluded that it was "not arbitrary nor capricious" for the District to refuse to pay intermediate teachers extra compensation "solely because they are required to spend more time in classroom instruction than teachers of other grade levels in the District," and that petitioners had "failed to establish any abuse of discretion by Respondents, . . ."

## Contentions

Petitioner contends the evidence shows without "substantial dispute" that "there is no real distinction between the teachers in Grades 4 through 6 and other teachers except that extra 16 percent of classroom instruction time required of teachers in Grades 4 through 6." On this basis, petitioner asserts that respondent District's pay schedule (1) violates Education Code section 13506 prohibiting salary differentials "solely on the basis of the respective grade levels" taught; (2) fails to meet the requirement that the fixing of salaries not be discriminatory, arbitrary or unreasonable; and (3) denies intermediate teachers equal protection as guaranteed by the Fourteenth Amendment to the United States Constitution.

Respondents contend that substantial evidence supports the trial court's findings that the nonclassroom duties of primary and secondary teachers exceed those of intermediate teachers, that such findings are, therefore, conclusive and justify the difference in classroom work load.

For the reasons hereinafter stated, we agree with respondent Board.

### The Trial Court Findings Are Conclusive if Supported by Substantial Evidence

As our Supreme Court said in *Taormino v. Denny,* 1 Cal.3d 679, 687 [83 Cal.Rptr. 359, 463 P.2d 711]: "The trial court is the arbiter of the facts, and this court cannot upset its decision as a matter of law when

substantial evidence supports the judgment." Beyond this, on appeal we are bound to "view the evidence in the light most favorable to the respondent and will indulge in all intendments and reasonable inferences to sustain the findings and the judgment." (*Gyerman* v. *United States Lines Co.,* 7 Cal.3d 488, 492, fn. 1 [102 Cal.Rptr. 795, 498 P.2d 1043].)

The judgment of the superior court denying petitioner a writ of mandate is reviewable in this court on appeal. (Code Civ. Proc., §§ 1110, 1064, 904.1; *Ross* v. *Municipal Court,* 49 Cal.App.3d 575, 576 [122 Cal.Rptr. 807]; *Mellinger* v. *Municipal Court,* 265 Cal.App.2d 843, 845 [71 Cal.Rptr. 535].) The scope of review is, therefore, governed by the above stated principles.

*Substantial Evidence Supports*
*the Trial Court's Findings*

■ Viewed in the light most favorable to respondents, the evidence in the trial court clearly supports its findings that the duties of intermediate teachers outside of classroom hours are substantially less burdensome than those of primary and secondary teachers.

The testimony of respondents' witnesses substantially supports the finding that primary teachers "must devote more time to lesson planning, motivation of individual children, and conferences with parents than teachers" of the intermediate grades. The conduct of respondent District in requiring its primary teachers to remain upon the school grounds the same number of hours as is required of intermediate teachers is consistent with this testimony. The contrary views expressed by petitioners' witness created no more than a conflict in the evidence, which it was the province of the trial court to resolve.

The evidence likewise supports the trial court's finding that teachers in the secondary grades have "a substantial amount of activities and duties outside of regular classroom hours" which intermediate grade teachers do not have. This evidence supports respondent Board's determination that secondary teachers require one 45-minute period of "free time" within the working day. The absence of any express requirement for specific extracurricular services is not determinative in view of the testimony that if it were not performed on a voluntary basis, it would be assigned, and that relatively equal participation in carrying this part of

"the normal load of the instructor" was enforced through criticism of slackers.

The special arrangement under which a very limited number of secondary teachers received one-sixth additional salary likewise fails to detract from the sufficiency of the evidence to support the trial court's findings. That evidence did not show that a normal work load for a secondary teacher did not include one free period. The incidence of this practice was so small and the circumstances under which it was indulged so limited that it was of negligible probative value in assessing the norm.

*The Trial Court's Findings*
*Establish the Propriety of*
*Respondents' Salary Schedule*

The trial court's findings establish that intermediate teachers were classified differently than primary or secondary teachers in respect of the number of hours in classroom instruction they were required to perform in order to earn their salaries, but that there was a rational basis for such classification. Such being the case, respondents' salary schedule violated neither the provisions of Education Code section 13506 prohibiting salary differences, "solely on the basis of respective grade levels," nor the principle of uniformity of treatment which limits respondent District's discretionary control over the salary of teachers.

*Education Code Section 13506 Does Not*
*Mandate Uniform Hourly Rates for Classroom*
*Instruction.for All Grade Levels*

Section 13506 of the Education Code prohibits payment to teacher employees of "different salaries, solely on the basis of the respective grade levels in which such employees serve." This provision does not impose equal hourly rates for classroom instruction. This is apparent when it is read in the light of other provisions of the Education Code dealing with the minimum school day and defining full-time employees. Section 13503 of the Education Code provides: "Every person employed by the district in a position requiring certification qualifications in a day school of the district for not less than the minimum schoolday for each day the schools of the district are maintained during the school year is a full-time employee and his compensation shall be fixed accordingly. Governing boards may require

persons employed in positions requiring certification qualifications to serve a longer period of time in each schoolday than the minimums defined in Sections 11003 to 11008, inclusive, and 11052, in order to be compensated as full-time employees, provided all such employees in similar grades or levels are similarly required to serve such longer periods of time, and provided that the duties required of such persons during such extended time shall be directly related to and restricted to their normal assignment. With respect to a unified school district, for the purposes of this section all day kindergarten and elementary schools of the unified school district shall be deemed to be maintained by one district, all day high schools of the unified school district shall be deemed to be maintained by a second and separate district, and all day junior colleges of the unified school district shall be deemed to be maintained by a third and separate district."

Sections 11003 to 11008, inclusive, and section 11052 established minimum school days of 180 minutes in kindergarten (§ 11003),[5] 230 minutes in grades 1, 2 and 3 (§ 11005), 240 minutes in grades 4 through 8 in elementary schools (§ 11006), and 240 minutes in any high school (§ 11052). It is, thus, apparent that the requirement of section 13503 that all teachers who teach for not less than the minimum school day be compensated as full-time employees necessarily contemplates that the equal salary provision for all grades imposed by section 13506 may result in different hourly rates for time spent in classroom instruction. Moreover, the second sentence of section 13503 specifically authorizes longer school days for all full-time employees, "provided all such employees in similar grades or levels are similarly required to serve such longer periods of time . . ." and that such be related and restricted to "their normal assignment." The Legislature thus specifically authorized normal assignments entailing varying lengths of school day for which the same regular salary is payable. Since the school day is the time in which the students are in attendance (see § 11006.5), it is apparent that different lengths of teacher-classroom duty for the same salary are authorized provided similar grades are similarly treated.

The other limitation imposed upon the power thus granted to school boards is that the required school day, in excess of the minimums for which regular salary is payable, shall be the normal assignment for the

---

[5]Section 11003 was repealed in 1972; however, the same minimum is now included in section 11301.

respective grade levels to which they are made applicable. Thus, the prohibition against salary discrimination based upon the "respective grade levels" contained in section 13506 cannot be circumvented by the establishment of artificially low normal assignments for preferred grade levels with extra compensation for additional service. Respondent District's practice of paying secondary teachers an extra one-sixth of their salary for teaching a seventh period must, therefore, be further scrutinized. If the practice were extended to include a substantial portion of secondary teachers, it would suggest that seven periods was normal and that payment of full salary for six periods was a means of bestowing a salary preference upon secondary teachers. The limited scope of and the extraordinary circumstances invoking extra compensation disclosed by the record in this case, however, do not suggest any such subterfuge.

*The Action of Respondent Board in*
*Determining Teachers' Salaries Must*
*Be Upheld if Not Palpably Unreasonable*

■ The determination of the salaries of permanent teachers is vested in respondent Board; section 13502 of the Education Code vests discretionary control over the salaries of teachers in the governing board of school districts.[6] Under previous enactments of similar import, it has uniformly been held by our Supreme Court that this power shall be exercised within reasonable limits. In *Fry* v. *Board of Education,* 17 Cal.2d 753, 757-758 [112 P.2d 229], our Supreme Court said: " 'It must be conceded that, within the limits fixed by the School Code, the Board has discretionary control over the salaries of teachers. (*Fidler* v. *Board of Trustees,* 112 Cal.App. 296 [296 Pac. 912]; *Abraham* v. *Sims,* 2 Cal. (2d) 698 [42 Pac. (2d) 1029].) However, it must also be conceded that the legislature had enjoined on such Boards, within reasonable limits, the principle of uniformity of treatment as to salary for those performing like services with like experience. This same limitation exists in the rules and regulations of the appellant Board. *This limitation, however, does not prevent the Board from making reasonable classifications.*' " (Italics added.)

---

[6]Section 13502 provides: "The governing board of any school district shall fix and order paid the compensation of persons in public school service requiring certification qualifications employed by the board unless otherwise prescribed by law."

A similar statement appears in *Kacsur* v. *Board of Trustees,* 18 Cal.2d 586, 591-592 [116 P.2d 593], where the court said: "Under section 5.731 of the School Code the administrative agencies may fix the salaries of teachers. It is now well established that a permanent teacher has no vested right to a particular salary and that such salary may be changed by the administrative authority. (See *Butterworth* v. *Boyd,* 12 Cal. (2d) 140 [82 Pac. (2d) 434, 126 A.L.R. 838]; *Abraham* v. *Sims, supra; Emerson* v. *Board of Trustees,* 23 Cal.App. (2d) 432 [73 Pac. (2d) 935]; *Hodge* v. *Board of Education,* 22 Cal.App. (2d) 341 [70 Pac. (2d) 1009]; *Fidler* v. *Board of Trustees, supra.*)   However, there are limitations on the power of boards of trustees to change salaries of permanent teachers. One of the 'legal consequences' referred to in the Abraham case, *supra,* is that the fixing of salaries must not be discriminatory, arbitrary or unreasonable. The above cited cases all so qualify the general power of the administrative agencies to fix the salaries of permanent teachers."

However, the function of a court reviewing the exercise of discretion by the governing board of a school district has been restrictively defined by the decision of our Supreme Court in *Rible* v. *Hughes,* 24 Cal.2d 437 [150 P.2d 455, 154 A.L.R. 137]. In that case, action of the school board reducing a teacher's salary because she failed to complete required graduate study was upheld. The court said (24 Cal.2d at pp. 444-445):

"These considerations apply with equal force to the appellant's remaining contention that the schedules and their conditions are unreasonable, arbitrary and discriminatory.

"*If reasonable minds may well be divided as to the wisdom of an administrative board's action, its action is conclusive.* Or, stated another way, if there appears to be some reasonable basis for the classification, a court will not substitute its judgment for that of the administrative body. (*Gabrielli* v. *Knickerbocker,* 12 Cal.2d 85 [82 P.2d 391]; *Monahan* v. *Department of Water and Power,* 48 Cal.App.2d 746 [120 P.2d 730].)   The completion of a course of study one summer out of each four has a reasonable relation to a teacher's ability to discharge his professional duties." (Italics added.) The same judicial restraint is exercised when the validity of classifications is tested in the context of equal protection of the law. (*Whittaker* v. *Superior Court,* 68 Cal.2d 357, 368 [66 Cal.Rptr. 710, 438 P.2d 358].)

The application of the above principles to the case at bench clearly justifies the trial court's action upholding respondent Board's discretion. The evidence showed that reasonable minds might "well be divided as to the wisdom of" the Board's action. The amount of class preparation required outside of classroom time and the quantity of extracurricular activities required of teachers certainly bear "a reasonable relation" to the establishment of a normal school day for teachers. There is nothing unreasonable in shortening the period of classroom instruction to accommodate for additional time required for the performance of the teacher's other duties. The trial court's findings, therefore, that primary and secondary teachers were called upon to devote more time to nonclassroom activities fully support the trial court's conclusions that the actions of respondent Board were neither arbitrary, capricious nor unreasonable.

The judgment is affirmed.

Ford, P. J., and Allport, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 21, 1976.