[No. D013680. Fourth Dist., Div. One. Apr. 26, 1991.]

CITY OF POWAY, Plaintiff and Respondent, v.
CITY OF SAN DIEGO et al., Defendants and Appellants.

COUNSEL

John W. Witt, City Attorney, C. Alan Sumption, Chief Deputy City Attorney, and Leslie J. Girard, Deputy City Attorney, for Defendants and Appellants.

Stephen M. Eckis, City Attorney, and McDougal, Love, Eckis, Grindle & O'Connor for Plaintiff and Respondent.

OPINION

**HUFFMAN, Acting P. J.**—In this case we must determine whether a city may close a portion of a regional roadway that continues beyond its city limits. We conclude Vehicle Code section 21101, subdivision (f)[1] confers no

---

[1] All statutory references are to the Vehicle Code unless otherwise specified.

Section 21101 in pertinent part provides: "Local authorities, for those highways under their jurisdiction, may adopt rules and regulations by ordinance or resolution on the

such authority upon city government. This matter is before us on an appeal by the City of San Diego et al. (San Diego) of the trial court's order granting a petition for writ of mandate (Code Civ. Proc., § 1085) and denying San Diego's motion for new trial. The petition was brought by the City of Poway (Poway), which successfully argued to the trial court that San Diego had no discretion under section 21101, subdivision (f) or any other statutory enactment to keep a portion of Pomerado Road, lying within the city limits of San Diego and adjoining Poway's border, closed to all traffic after that portion was reconstructed and improved. We affirm the decision issuing the writ and conclude the motion for new trial was properly denied. The trial court correctly applied section 21101, subdivision (f) and the rules relating to general plan amendments that are effectively incorporated into that section.

### FACTUAL AND PROCEDURAL BACKGROUND

To analyze the issues raised by the petition for writ of mandate, we must discuss some of the history of Pomerado Road (the road) and the intricacies of the land use planning decisions that have been made about it. Since 1908, the road has connected Poway, Ramona, and other areas of northeast San Diego County with San Diego proper. It was designated as part of the state highway system in the 1930's and as part of the federal highway system in the 1950's, although neither of these designations is currently in effect. It is now a city surface street which traverses the Scripps Miramar Ranch community within San Diego's jurisdiction, beginning at its intersection with Interstate 15, continuing northeasterly into Poway's jurisdiction after intersecting with Poway Road.

This road has been accorded various designations in various planning documents. San Diego's "Progress Guide and General Plan" (general plan) and map designate it as an open "major street."[2] The County of San Diego's

---

following matters: . . . [¶] (f) Prohibiting entry to, or exit from, or both, from [*sic*] any street by means of islands, curbs, traffic barriers, or other roadway design features to implement the circulation element of a general plan adopted pursuant to article VI (commencing with § 65350) of chapter 3 of division 1 of title 7 of the Government Code. The rules and regulations authorized by this subdivision shall be consistent with the responsibility of local government to provide for the health and safety of its citizens."

[2] The format of San Diego's general plan consists of a booklet entitled "Progress Guide and General Plan," together with a map depicting such elements of the plan as residential and commercial areas, parks, public works, and transportation facilities such as streets and highways. (Gov. Code, § 65300.) Pursuant to Government Code section 65302, subdivision (b), one of the elements to be included in the general plan is a circulation element "consisting of the general location and extent of existing and proposed major thoroughfares, transportation routes, terminals, and other local public utilities and facilities, all correlated with the land use

general plan map designates the road as "major." In Poway's general plan, it is designated a "major arterial."

The parties started down the path leading to this dispute in 1987, when San Diego initiated proceedings to annex a tract of land known as the "County Island," lying between Spring Canyon Road and the City of Poway, now a portion of the Scripps Miramar Ranch community. This annexation brought part of the road, known as the Pomerado Road Grade, under San Diego's jurisdiction. Because this portion of the road did not conform to San Diego design standards, San Diego required the developer working in the area to upgrade the road (in several phases) into a four-lane major road connecting to a section of the road previously widened and improved by Poway.

The first steps necessary to close the substandard portion of the road (about one and one-half miles) for construction[3] were taken in 1987 when the Scripps Miramar Ranch Community Plan (specifically, its transportation element) was amended by resolution number R-268716 adopted by San Diego's city council. Pursuant to normal planning procedure, the resolution contemplated that an amendment of San Diego's general plan would be made to implement it. The resolution provided that the road would be closed until another route known as alternative 8A (or the Scripps North Parkway) was constructed, connecting the road with Interstate 15 at the Mercy Road interchange. According to San Diego's city planners, both the reconstruction of the road and the construction of alternative 8A were to be completed around the same time. However, although the current phase of

---

element of the plan." (*Ibid.*) In San Diego's general plan, the circulation element is called a "transportation element."

San Diego's general plan is amended from time to time (Gov. Code, § 65350 et seq.); however, not all amendments are immediately incorporated into the booklet and map format because of the expenses involved in updating the materials. This general plan is implemented pursuant to Government Code section 65450 et seq. by specific plans for the various communities in the greater San Diego area. One such specific plan is the Scripps Miramar Ranch Community Plan. The statutory scheme contemplates that the specific plan shall implement and be consistent with the general plan of the area. (Gov. Code, §§ 65301, subd. (b), 65450, 65452, 65454.)

At oral argument, counsel for San Diego drew a distinction between specific plans (Gov. Code, § 65450 et seq.) and community plans. In their legal analysis of the community plan, the parties have cited as applicable authority the Government Code sections pertaining to specific plans. For our purposes, we may treat the community plan as a type of specific plan.

[3] The closure of the road was accomplished pursuant to section 21367, which permits local authorities or the Department of Transportation to restrict and regulate traffic on a highway under construction in order to protect the safety of workers or motorists or where the work would interfere with the flow of traffic. Note that the terms "highway" and "street" (§§ 360, 590) in the Vehicle Code may be treated as synonymous for purposes of analysis of this type of issue. (*Rumford* v. *City of Berkeley* (1982) 31 Cal.3d 545, 550, fn. 5 [183 Cal.Rptr. 73, 645 P.2d 124].)

reconstruction of the road has been completed, construction of alternative 8A will take at least two more years.

The next step in the city planning process to effectuate resolution No. R-268716, closing the road, was to amend San Diego's general plan to include it. Toward that end, San Diego's city council passed resolution No. R-269983 on December 8, 1987. This was an omnibus provision incorporating numerous (i.e., 32) specific community plan amendments into San Diego's general plan.[4] Two maps attached to resolution No. R-269983 showed the road, one designating it as an open major street.

The environmental effects of the road closure were studied in an environmental impact report which was made available for public review in August 1988. San Diego adopted the report's findings and issued a "Statement of Overriding Considerations" to justify the closure of the road until the alternative route, alternative 8A, was opened.

The road was actually closed for reconstruction in November 1988. At that time, the average daily traffic on that section of the road at the Poway city limit was over 5,000 vehicles per day. As reconstructed, the road currently has an estimated capacity of 15,000 vehicles per day.[5] Traffic studies project that 34,000 vehicles per day will travel the road by the year 2010.[6] Due to the closure of the road, traffic volumes on Poway Road between Pomerado Road and Interstate 15 have increased by more than 5,000 vehicles a day, leading to frequent gridlock conditions. At the hearing on the petition for writ of mandate, San Diego produced evidence showing that the former County Island is currently in various stages of development and that when homes built in the area are occupied, congestion on the reopened road would be worse than before the road was closed, if the planned alternative 8A were not also opened to accommodate some of the traffic.

As the reconstruction of the road progressed during the spring of 1990, San Diego's city council obtained advice from its city attorney's office that when reconstruction was complete, San Diego would no longer have any authority under the provisions of section 21367 to keep the road closed. Poway formally requested in October 1990 that the road be reopened upon

---

[4] As we will later explain, the text of resolution No. R-269983, the general plan amendment, disappeared from view and was not found until the time of the motion for new trial on the petition for writ of mandate.

[5] It should be noted that only a one and one-half-mile portion of the road has been reconstructed and enlarged; part of the remaining stretch within San Diego's jurisdiction remains a two-lane roadway.

[6] This fact is shown in a San Diego Association of Governments (SANDAG) study, cited in Poway's city engineer's declaration in support of the petition for writ of mandate.

the completion of reconstruction. San Diego's city council initially agreed to reopen the road, but reversed itself and voted on November 5, 1990, to keep the road closed. Further environmental review was planned for the eventual reopening of the road when alternative 8A was completed.

One week after the City Council's action, Poway filed its petition for writ of mandate, alleging San Diego had a mandatory duty to reopen the road on completion of construction. No alternative writ or temporary restraining order was sought. San Diego answered the petition, asserting various defenses such as laches, bar of the statute of limitations (Gov. Code, § 65009), and authority to take the actions complained of under its police power. It claimed authority under the provisions of section 21101, subdivision (f), to prohibit entry to the road in order to implement the transportation element of its general plan. It also contended its general plan showing the road and alternative 8A as open should be interpreted as a depiction of the future goals to be met in its transportation element.

At a hearing held December 20, 1990, the trial court took judicial notice of the various public enactments and the general plan and its map.[7] After hearing argument, the court found none of the affirmative defenses had merit, granted the petition, and issued the writ commanding that the road be opened without further delay. The court's decision and order recited that state law had preempted the field of traffic control and ruled that section 21101 did not empower San Diego to maintain the closure of the road because continued closure did not implement any element of San Diego's general plan. Specifically, the court found the road had regional significance and was designated an open major street in the general plan; amendment of the Scripps Miramar Ranch community plan (by resolution No. R-268716) did not constitute an amendment of San Diego's general plan, as required for section 21101, subdivision (f) to apply.[8]

Shortly after the hearing, San Diego sought a stay or modification of the writ to delay its effective date; a short stay was granted. San Diego then moved for new trial on the basis of newly discovered evidence: resolution No. R-269983, which provided that the general plan was amended to incorporate the provisions of resolution No. R-268716, which had amended the

---

[7] Pursuant to Evidence Code section 459, subdivision (a), this court takes judicial notice of all items judicially noticed below, including resolution No. R-269983, the "newly discovered" evidence presented in connection with the motion for new trial. In addition, we granted San Diego's request on appeal that we take notice of the fact of San Diego's geographic size and diversity. (Evid. Code, § 453, subd. (b).)

[8] As noted above (see fn. 4, *ante*), no evidence was presented at the time of the hearing on the petition about the existence of resolution No. R-269983, which amended the general plan, because it was not rediscovered until after the original hearing date. See our discussion of the motion for new trial, *post*.

transportation element of the Scripps Miramar Ranch community plan and closed the road until alternative 8A was completed. San Diego explained that it had not discovered the existence of resolution No. R-269983 during its preparations for the hearing on the petition, which had included a computer word search of city planning files and contacts with knowledgeable city employees. The copy of the general plan booklet available to the public does not show any amendment designating the road as closed. Pending the hearing, San Diego appealed the order granting the petition, and this court ordered an expedited briefing schedule.

At the hearing on the motion for new trial, the court found San Diego had made an inadequate showing of reasonable diligence in producing the newly discovered evidence; in any case, the court found, the evidence was not material. (Code Civ. Proc., §§ 657, subd. 4, 1092, 1110.) In discussing the probative value of the newly presented evidence, the court noted that even if it were considered, it did not justify a different result, since the "purported amendment" (i.e., resolution No. R-269983) was not validly enacted. Specifically, the court stated:

"[T]he resolution was never incorporated into the public version of the general plan . . . the Government Code . . . envisions that the plan is going to be made available for public inspection and use, and not some version of the plan which contains some of the elements of the plan and doesn't contain other purported elements of the plan."

The trial court further noted that the map attached to the omnibus resolution showed the road to be an open major road connecting the two cities, which was inconsistent with the text of the same resolution that closed the road. The court adhered to its original rationale for granting the petition for writ of mandate (there was no effective amendment to the general plan) and did not reach the issue of whether section 21101, subdivision (f) forbade any such amendment to the general plan to close such a roadway. The motion for new trial was denied. Poway then requested that the trial court relieve it of the automatic stay provisions of Code of Civil Procedure section 1110, subdivision (b). The request was denied; the road remains closed today.

## DISCUSSION

Our consideration of whether section 21101, subdivision (f) accords San Diego the discretion to maintain the closure of the road must address both a narrow and a broad issue. First, the narrow question is whether this particular set of enactments met the requirements of the section that rules and regulations be duly adopted "to implement the circulation element of a

general plan . . ." (§ 21101, subd. (f)), in conformity with the Government Code scheme. Second, the broader issue is whether, even if the general plan amendment were properly enacted, section 21101, subdivision (f) would allow a local authority to implement the circulation element of its general plan by closing a regional roadway in order to prevent the local inconveniences created by large volumes of through traffic through the local authority's jurisdiction. We answer both these questions in the negative. San Diego's general plan amendment to require the continued closure of the road was defective in form and in substance.

Before discussing the specific issues presented, we shall set forth the basic principles that guide our analysis. First, however, we respond to San Diego's threshold argument that although the issue presented is whether a local authority has discretion under section 21101, subdivision (f) to close a road, we cannot inquire in this proceeding into the exercise of such discretion, as that would have required different pleadings by Poway as petitioner. We need not reach any such hypothetical scenario, however, since we confine our inquiry to the proper interpretation of the scope of the power afforded to San Diego by this statute. Finding, as we shall, that San Diego exceeded its powers under section 21101, subdivision (f), we need not consider whether it abused any limited discretion actually accorded to it by the Legislature.

■ The rule of state preemption of authority to prescribe traffic rules was set out by the Supreme Court in *Rumford* v. *City of Berkeley, supra,* 31 Cal.3d 545, 549-550:

" 'The streets of a city belong to the people of the state, and every citizen of the state has a right to the use thereof, subject to legislative control . . . . The right of control over street traffic is an exercise of a part of the sovereign power of the state . . . .' (*Ex parte Daniels* (1920) 183 Cal. 636, 639.) ' "The use of highways for purposes of travel and transportation is not a mere privilege, but a common and fundamental right, of which the public and individuals cannot rightfully be deprived . . . [A]*ll persons have an equal right to use them for purposes of travel by proper means,* and with due regard for the corresponding rights of others. [Citations.]" ' [Italics added, fns. omitted.]

"The state's plenary power and its preemption of the entire field of traffic control are stated in Vehicle Code section 21: 'Except as otherwise expressly provided, the provisions of this code are applicable and uniform throughout the state and in all counties and municipalities therein, and *no local authority shall enact or enforce any ordinance on the matters covered by this code unless expressly authorized therein.*' (Italics added.) Thus, unless 'expressly

provided' by the Legislature, a city has no authority over vehicular traffic control. [Citations.]"

The delegation of power to local authorities to enact traffic regulations applicable within their jurisdictions is strictly construed. (*Rumford* v. *City of Berkeley, supra*, at p. 550; *City of Lafayette* v. *County of Contra Costa* (1979) 91 Cal.App.3d 749, 756 [154 Cal.Rptr. 374].) Any such delegation of power must be expressly, not impliedly, authorized by the Legislature. (*Ibid.*)

To examine the scope of the delegation in section 21101, subdivision (f), we apply the usual rules of statutory construction. (Code Civ. Proc., §§ 1858, 1859; Civ. Code, §§ 3534, 3541.) ■ We seek to ascertain the intent of the Legislature so as to effectuate the apparent purpose of the law. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal.Rptr. 67, 743 P.2d 1323].)

"[T]he provision must be given a reasonable and common sense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, which upon application will result in wise policy rather than mischief or absurdity. [Citations.] Significance, if possible, should be attributed to every word, phrase, sentence and part of an act in pursuance of the legislative purpose, as 'the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole.' [Citation.] ' "The court should take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction." ' [Citations.]" (*DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 18 [194 Cal.Rptr. 722].)

■ "In addition, the Legislature is deemed to be aware of existing laws and judicial decisions in effect at the time legislation is enacted and to have enacted and amended statutes ' "in the light of such decisions as have a direct bearing upon them." ' [Citations.]" (*People* v. *Overstreet* (1986) 42 Cal.3d 891, 897 [231 Cal.Rptr. 213, 726 P.2d 1288].)

■■■■ ■ In our normal procedure for reviewing an order deciding a petition for writ of mandate, we seek to determine if the decision of the trial court was supported by the evidence and was a proper exercise of discretion. (*Centinela Valley Secondary Teachers Assn.* v. *Centinela Valley Union High Sch. Dist.* (1974) 37 Cal.App.3d 35, 38 [112 Cal.Rptr.

27].)[9] On appeal, we are to view the evidence in the light most favorable to the respondent, with all intendments and reasonable inferences made to sustain the findings and the judgment. (*Lompoc Federation of Teachers* v. *Lompoc Unified Sch. Dist.* (1976) 58 Cal.App.3d 701, 710 [130 Cal.Rptr. 70], disapproved on another point in *Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (1978) 21 Cal.3d 650, 665-666 [147 Cal.Rptr. 359, 580 P.2d 1155].) As requested (see fn. 7, *ante*), we have taken judicial notice of the various public enactments and their documentation pursuant to Evidence Code section 459, subdivision (a). Consequently, and because these basic facts are largely undisputed, our evaluation of this record is conducted de novo, in determining as matters of law the proper construction of the statutes involved and their application. (*Estate of Madison* (1945) 26 Cal.2d 453, 456-457 [159 P.2d 630].)

I

*Validity of the Amendment*

Government Code section 65300 et seq. sets forth a comprehensive scheme for the enactment and amendment of general plans by local planning agencies. ■ "The general plan is atop the hierarchy of local government law regulating land use. It has been aptly analogized to 'a constitution for all future developments.' [Citation.]" (*Neighborhood Action Group* v. *County of Calaveras* (1984) 156 Cal.App.3d 1176, 1183 [203 Cal.Rptr. 401].) A general plan is by its nature tentative and subject to change. (*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 118 [109 Cal.Rptr. 799, 514 P.2d 111].) It is a "conceptual proposal." (*Atherton* v. *Board of Supervisors* (1983) 146 Cal.App.3d 346, 351 [194 Cal.Rptr. 203].)

The citation in section 21101, subdivision (f) of the statutes regarding general plans incorporated by reference that body of law. By its terms, section 21101, subdivision (f) permits local authorities to adopt regulations prohibiting entry to or exit from streets (or highways; see fn. 3, *ante*) by means of specified roadway design features "to *implement the circulation element* of a general plan . . . ." (Italics added; see complete text of subdivision at fn. 1, *ante*.) ■ Pursuant to accepted methods of statutory

---

[9] With respect to the order denying San Diego's motion for new trial, it is reviewable for abuse of discretion. (*Johns* v. *City of Los Angeles* (1978) 78 Cal.App.3d 983, 987-990 [144 Cal.Rptr. 629].) As succinctly explained by San Diego in its opening brief, the issues surrounding the new trial motion (the finding of a lack of reasonable diligence in producing new evidence and the probative value of that evidence) are moot in light of the judicial notice taken by the trial court and this court of the existence of the newly discovered evidence offered in support of the motion, i.e., resolution No. 269983. Pursuant to our judicial notice procedure, we consider the merits of the material offered, not the meritoriousness of the trial court's evaluation of it.

construction (*DeYoung* v. *City of San Diego, supra*, 147 Cal.App.3d 11, 18), our task is to examine the plain language of this section to ascertain its applicability, with recourse to the legislative history if necessary to ascertain legislative intent. (*Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra*, 43 Cal.3d at pp. 1386-1387.)

Before turning to the specific language of section 21101, subdivision (f), however, we briefly outline the portions of the Government Code creating the elements of general and specific plans, which the Legislature effectively incorporated by reference into this Vehicle Code provision. Government Code section 65301, subdivision (b) permits the local legislative body to adopt its general plan as a single document or as a group of documents relating to separate subjects or geographic segments of the planning area. San Diego follows the procedure of adopting a group of documents, including the general "Progress Guide and General Plan" and several specific plans (Gov. Code, § 65450 et seq.) for different geographical communities, such as the one involved here, Scripps Miramar Ranch. (See fn. 2, *ante*.) San Diego's general plan booklet (at pages 14, 249) states that these community plans are intended to act as supplements to the general plan with regard to the specific programs contained therein, such as a transportation element.

Where specific plans are used for different communities, as here, such plans shall provide for the systematic implementation of the general plan. (Gov. Code, §§ 65450, 65452.) Under Government Code section 65453, subdivision (b), a specific plan may be amended in the same manner as a general plan. The general plan and its parts are required to be integrated and consistent documents under Government Code section 65300.5. Specific plans must be consistent with general plans (Gov. Code, § 65454), and local projects must be consistent with specific plans. (Gov. Code, § 65455.)

Under Government Code section 65302, general plans are required to include certain planning elements, including, under subdivision (b) of that section, a "circulation element consisting of the general location and extent of existing and proposed major thoroughfares, transportation routes, terminals, and other local public utilities and facilities, all correlated with the land use element of the plan." San Diego's general plan includes the following finding concerning the transportation element of the plan: "The street and highway system designated by the City of San Diego and shown on the General Plan Map includes the freeways, expressways, and arterial streets needed to provide a reasonable level of mobility and accessibility within the City, as well as between San Diego and other cities in the metropolitan area." Moreover, under Government Code section 65451, subdivisions

(a)(2) and (b), specific plans shall also include a transportation element and a statement of the relationship of the specific plan to the general plan.

Where amendment of a general plan is required, it must be accomplished pursuant to Government Code section 65350 et seq. Under section 65357, subdivision (b) of that article, copies of documents amending a general plan, including the diagrams and text, must be made available to the public as follows:

"(1) Within one working day following the date of adoption, the clerk of the legislative body shall make the documents adopting or amending the plan, including the diagrams and text, available to the public for inspection.

"(2) Within two working days after receipt of a request for a copy of the adopted documents adopting or amending the plan, including the diagrams and text, accompanied by payment for the reasonable cost of copying, the clerk shall furnish the requested copy to the person making the request." General restrictions on the frequency of amendments to a general plan are set forth in Government Code section 65358 (usually no more than four times per year). The general plan version in effect at the time of trial provides that all amendments made through June 1989 had been incorporated therein.

 Since section 21101, subdivision (f) requires that the specified roadway design features be used "to implement the circulation element of a general plan," we must determine the extent of San Diego's compliance with the Government Code sections outlined above in order to assess the validity of the continued road closure. Once the construction activity on the road had been completed, no authority pursuant to section 21367 remained to keep the road closed; the only asserted authority to maintain the closed status was section 21101, subdivision (f).[10] San Diego argues it has the discretion to decide the road should remain closed because this closure implements the circulation element of its general plan. Specifically, it contends that because its general plan amendment (resolution No. R-269983) was designed to incorporate the amendment of the Scripps Miramar Ranch community plan which closed the road (resolution No. R-268716), the general plan's transportation element must necessarily include the transportation element of the community plan. San Diego relies on the Government Code sections which allow a general plan to be made up of several documents, including specific (community) plans. (Gov. Code, §§ 65301, subd. (b), 65450 et seq.) Thus, the argument goes, the requirements of section

---

[10] San Diego never relied on section 21101, subdivision (a) (providing a local authority may close a highway when it is no longer needed for vehicular traffic) to justify its continued closure of the road. No finding was ever made by the city council that no need for the road existed.

21101, subdivision (f) are satisfied: the road closure implements the general plan's circulation element.

We find several flaws in this analysis. The most obvious defect in the effectiveness of resolution No. R-269983 is that it was never made available to the general public as required by Government Code section 65357, subdivision (b); in fact, the existence of that resolution was forgotten by the public officials charged with creating and implementing it, until after the original hearing on this petition for writ of mandate. The duties imposed by Government Code section 65351, requiring public agencies to provide opportunities for the public to become involved in amendments to the general plan, were thus not met. ■■ ■ ■ ■ As far as could be determined from the documents, the amendment of the Scripps Miramar Ranch community plan never affected San Diego's general plan.[11] While it is reasonable to require members of the public to be aware of the existence of the various community and specific plans and their effect upon the terms of a general plan, such required awareness should only extend to the specific components of the community plan that affect that community. San Diego's general plan acknowledges this relationship when it states: "Such [community] plans must remain as official guidelines for the development of communities and subareas and act as supplements to the General Plan with regard to the more specific proposals and programs normally associated with community plans." It is inconceivable to us that the closure of a portion of a regional roadway should be considered to be one of those "more specific proposals and programs normally associated with community plans."

Similarly, at all times San Diego's general plan and its maps have shown the road to be an open major road, as did the maps attached to the omnibus amendment, resolution No. R-269983. The text of the general plan booklet, in the June 1989 version in effect at trial, did not include any indication that the road was or would remain closed. Even though the general plan is always subject to change (*Selby Realty* v. *City of San Buenaventura, supra,* 10 Cal.3d 110, 118), the material in the plan must have some current utility

---

[11] We are aware of the legislative history of the act reforming local planning, of which these articles concerning general and specific plans are a part: "It is the intent of the Legislature in enacting this act to consolidate and simplify statutes relating to local planning. It is not the intent of the Legislature to mandate new programs or higher levels of services on cities and counties." (Stats. 1984, ch. 1009, § 43, p. 3512.) Despite this statement, it is well established that adequate notice to the public is required to achieve the purposes of the Planning and Zoning Law (Gov. Code, § 65000 et seq.) to create and maintain general plans that meet the requirement of Government Code section 65300.5 for an " 'integrated, internally consistent and compatible statement of policies.' " (*Lesher Communications, Inc.* v. *City of Walnut Creek* (1990) 52 Cal.3d 531, 542-543 [277 Cal.Rptr. 1, 802 P.2d 317].)

in order for the public to become informed of the current and projected land uses depicted in the plan. Thus, we are unconvinced by San Diego's argument that although the road is shown to be open, as is the future alternative 8A roadway, that designation has merely future effect and does not currently bind San Diego's planning process with respect to any public reliance that may have been made on the components of the plan.

 ██ ██ ██ ██ Moreover, the terms of a specific plan are required by statute to be consistent with (Gov. Code, § 65454) and to implement (Gov. Code, § 65450) the general plan.[12] In the general plan's transportation element, the finding is made (at page 249) that the street and highway system shown on the general plan map includes the routes needed to provide mobility and accessibility within the city, "*as well as between San Diego and other cities in the metropolitan area.* This system reflects the buildout of the urbanized and planned urbanizing areas of San Diego and the surrounding areas as provided for in local general and community plans." (Italics added.) Therefore, a community plan that provided for closure of the road would be contrary to and would not implement this statement in the general plan.

Finally, resolution No. R-268716 amending the community plan was not self-executing; by its terms it required a general plan amendment to implement it. (See *Uhler* v. *City of Encinitas* (1991) 227 Cal.App.3d 795, 808 [278 Cal.Rptr. 157], holding enabling legislation is necessary to comply with the requirements of section 21101, subdivision (f).) When the general plan omnibus amendment was enacted, it was not done in accordance with the requirements of Government Code section 65357, subdivision (b), to make it available to the public. After that general plan amendment disappeared from view, the community plan was treated as a community plan with neighborhood applicability only. Therefore, once the authority of section 21367 to keep the road closed during construction expired, San Diego had no basis to treat the community plan as effective under section 21101, subdivision (f) "to implement the circulation element of a general plan." (*Ibid.*) The trial court correctly concluded the requirements of section 21101, subdivision (f) had not been met.

---

[12] The trial court rejected San Diego's affirmative defenses based on laches and the statute of limitations (Gov. Code, § 65009, subd. (c)) for challenges to the internal consistency of the general plan. We likewise find Poway acted appropriately in bringing this petition to interpret the provisions of the Vehicle Code after San Diego declined to reopen the road, rather than bringing a direct attack on the community plan or general plan amendments pursuant to Government Code section 65009, subdivision (c).

## II

### *Scope of Authority Conferred by Section 21101, Subdivision (f)*

 Recognizing that reasonable minds may differ on the issue of the validity of the general plan amendment, and in an abundance of caution, we embark upon an analysis of the validity of such a road closure in the event proper planning procedures are followed, even though we have found such was not the case here. The trial court expressly declined to rest its decision on the abstract question of whether a municipality may amend its general plan to provide for closure of a regional roadway, instead granting the petition solely on the basis of the improper procedure followed in amending the general plan. We will not be so cautious, since the issue is fully presented for decision and the interpretation of this statute is a question of law ripe for our review. (See *Estate of Madison, supra,* 26 Cal.2d 453, 456-457.) Although in general this writ proceeding invokes the doctrines of equity (*San Diego County Dept. of Pub. Welfare* v. *Superior Court* (1972) 7 Cal.3d 1, 9 [101 Cal.Rptr. 541, 496 P.2d 453]), the issues framed by these pleadings are purely statutory and we will treat them as such.

For guidance, we return to the principles of statutory construction outlined in *De Young* v. *City of San Diego, supra,* 147 Cal.App.3d 11, 18. We strive for a reasonable and commonsense interpretation which will lead to "wise policy rather than mischief or absurdity." (*Ibid.*) We are reminded by *Rumford* v. *City of Berkeley, supra,* 31 Cal.3d at page 550, that the delegation of power to prescribe traffic regulation must be strictly construed; there, the court explained: "Most traffic laws are to some extent discriminatory. In large measure they determine which traffic may use streets under what circumstances. Nonetheless, localities have no carte blanche and absent express authority, may not determine which traffic shall and which shall not use streets." (31 Cal.3d at p. 554.)

San Diego, having taken the position that its general plan amendment was effective, goes on to argue that the plain language of section 21101, subdivision (f) supports the actions it took. That statute deals with "roadway design features" utilized to implement a general plan's circulation element (e.g., islands, curbs, traffic barriers, etc.). The legislation creating this subdivision explained the necessity for it:

"The recent California Supreme Court decision in Rumford v. City of Berkeley (S.F. 24239) may make some existing traffic control devices illegal. In order to keep existing traffic control devices operational until a perma-

nent solution is developed, it is necessary that this act take effect immediately." (Stats. 1982, ch. 749, § 8, p. 2968.)

 Evidently, the purpose of the statute was to legalize certain means of traffic control, not to create a broad new delegation of authority to municipalities to close roadways. Consistent with the preemption provisions of section 21, the requirement in section 21101, subdivision (f) that rules and regulations must be adopted to implement a general plan's circulation element appears to be a term of limitation of the powers conferred, not an expansion of them. (See *Rumford* v. *City of Berkeley, supra*, 31 Cal.3d at pp. 549-550.) Similarly, when this urgency legislation was made permanent the following year, the Legislature added two additional terms of limitation: (1) in the preamble, that the local authorities could adopt such rules *for those highways under their jurisdiction*, and (2) that these rules "shall be consistent with the responsibility of local government to provide for the health and safety of its citizens." (§ 21101, subd. (f).) Again, the stated limitations on the operation of this section create the inference that no new delegations of power other than those narrowly defined in the section were intended. (See *City of Lafayette* v. *County of Contra Costa, supra*, 91 Cal.App.3d at p. 756.)

We find support for this conclusion in the Supreme Court's disapproval in *Rumford* (*supra*, 31 Cal.3d at pp. 552-554) of an earlier Court of Appeal case, *Snyder* v. *City of South Pasadena* (1975) 53 Cal.App.3d 1051 [126 Cal.Rptr. 320], which involved facts similar to those here. In *Snyder*, South Pasadena had barricaded a street at its boundary with Los Angeles, "to prevent Los Angeles traffic from turning onto the street," on the basis that the street was no longer needed for through traffic. (*Rumford* v. *City of Berkeley, supra*, 31 Cal.3d at p. 552.) The Supreme Court found no justification for the Court of Appeal's upholding of that action under the police power, the power to maintain streets, judicial precedent, or in the basic rule that "delegations of power to cities regarding vehicular traffic will be strictly construed." (*Id.* at p. 553.) In view of the legislative and judicial history of section 21101, subdivision (f), San Diego's "plain language" argument is not persuasive.

 Based on this reasoning, we do not believe that the Legislature intended that section 21101, subdivision (f) create broad new powers in local authorities to close roadways. Such authorities are restricted by the terms of the section to regulation of "those highways under their jurisdiction;" however, the Legislature did not specify "under their *exclusive* jurisdiction." That term of exclusivity was used in section 21104, but taken in context in that section (dealing with approval of local regulations over state highways) is less than informative as to the proper meaning of the term

"jurisdiction" in section 21101. (See also *Ramsey v. City of Lake Elsinore* (1990) 220 Cal.App.3d 1530, 1537-1538 [270 Cal.Rptr. 198].)

Assuming that the addition of the term, "for those highways under their jurisdiction," to the preamble of section 21101 was an effort by the Legislature to limit the delegation of power over traffic affairs, consistent with section 21, we think that the dictates of "wise policy" (*DeYoung v. City of San Diego, supra*, 147 Cal.App.3d at p. 18) require that section 21101, subdivision (f) should not be interpreted to allow one municipality to close its portion of a regionally significant, safely designed and maintained roadway for reasons of self-interest, to the detriment of those other members of the motoring public who seek to travel the entirety of that road. "The streets of a city belong to the people of the state, and every citizen of the state has a right to the use thereof, subject to legislative control . . . ." (*Ex parte Daniels* (1920) 183 Cal. 636, 639 [192 P. 442, 21 A.L.R. 1172].) A proper interpretation of the term "jurisdiction" as used in section 21101, subdivision (f) is a narrow one which recognizes that one local authority's actions within its own jurisdiction may not infringe upon the rights of other citizens of the greater metropolitan area to travel from community to community on publicly owned and controlled streets and highways.

Moreover, the provision in section 21101, subdivision (f) that the rules and regulations authorized by that section shall be "consistent with the responsibility of local government to provide for the health and safety of its citizens," must be read in light of the applicable authority discussed above. Legislative history materials are also instructive. In a letter to the Governor dated July 7, 1983, seeking signature of the bill which made section 21101, subdivision (f) permanent (Assem. Bill No. 366), the author of the bill (Assemblyman Thomas H. Bates) explained the intended scope of the legislation:

"[The] bill gives cities the explicit permission to partially restrict entry and access flow to a street, rather than require a complete closure, as with current law. However, the bill also states that *any such regulation must be consistent with local public health and safety, which is especially important with regard to emergency vehicles and routes.*" (Italics added.)

In an enrolled bill report on the legislation prepared by the Business and Transportation Agency, recommending that the bill be signed, the author of the staff report concludes, "The traffic barrier issue is a local one. The bill will return it to its proper forum—local government." (Enrolled Bill Rep., Bus. & Transportation Agency, Dept. Transportation (July 7, 1983) Assem. Bill No. 366.) Consistent with these expressions of legislative intent, we do not believe the Legislature anticipated that its enactment of section 21101,

subdivision (f) would serve to empower any local authority to promote the health and safety of its own citizens by interfering with the rights of other members of the public to safely travel on the public streets.

In conclusion, we address San Diego's gloomy prediction that a strict interpretation of the jurisdictional scope of section 21101, subdivision (f), such as Poway has proposed and we have adopted, would endanger the rights of local authorities to regulate traffic in the other ways made permissible by section 21101, subdivisions (a) through (e). Each of those means of traffic control (e.g, closing a highway that is no longer needed (subd. (a)), designating a highway to be a through highway and installing traffic control devices (subd. (b)); prohibiting certain vehicles from using certain highways (subd. (c)); or temporarily closing streets for driver training or parades (subds. (d), (e))) falls far short of a total prohibition of travel on a functional regional road, and can be reasonably and fairly implemented to equally affect all members of the public. San Diego's action in this instance did not meet those standards.

Regionally significant streets or highways perform a regional, not a municipal function. The fact that some hardship is created by the intensive use of a road upon those whose homes or businesses are located along the roadway is not dispositive in light of these well-established principles. A parochial decision that goes beyond the scope of section 21101 to close part of a functional regional road that crosses two or more jurisdictions, by means of a general plan or its amendment, is inconsistent with settled law. Section 21101, subdivision (f) does not authorize the action taken by San Diego to maintain the closure of this completed road.

DISPOSITION

The order is affirmed.

Froehlich, J., and Amos, J.,* concurred.

A petition for a rehearing was denied May 17, 1991.

---

* Assigned by the Chairperson of the Judicial Council.