Filed 7/10/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ORANGE CITIZENS FOR PARKS AND RECREATION et al., | G047013 |
| Petitioners, | |
| v. | |
| THE SUPERIOR COURT OF ORANGE COUNTY, | |
| Respondent; | |
| MILAN REI IV LLC et al., | |
| Real Parties in Interest. | |
| ORANGE CITIZENS FOR PARKS AND RECREATION et al., | G047219 |
| Plaintiffs and Appellants, | (Super. Ct. No. 30-2011-00494437) |
| v. | O P I N I O N |
| MILAN REI IV LLC et al., | |
| Defendants and Respondents. | |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Robert Moss, Judge. Petition denied. Appeal from a judgment of the Superior Court of Orange County, Robert Moss, Judge. Affirmed in part, reversed in part, and remanded.

Shute, Mihaly & Weinberger, Rachel B. Hooper, Robert S. Perlmutter, Susannah T. French; and Daniel P. Selmi for Petitioners, Plaintiffs, and Appellants Orange Citizens for Parks and Recreation and Orange Park Acres.

Woodruff, Spradlin & Smart and David A. DeBerry for Real Parties in Interest, Defendants, and Respondents Mary Murphy, City Clerk of the City of Orange, the City of Orange City Council, and City of Orange.

Duane Morris, Colin L. Pearce, David E. Watson, and Heather U. Guerena for Real Party in Interest, Defendant and Respondent Milan REI IV, LLC.

Nicholas S. Chrisos, County Counsel and Leon J. Page, Deputy County Counsel for Real Party in Interest, Defendant, and Respondent Neal Kelley, Orange County Registrar of Voters.

Milan REI IV, LLC (Milan) is the current owner of 51 acres of land (the Property) in the Orange Park Acres neighborhood of the City of Orange (the City). Between 1968 and 2006, the Property featured a nine-hole golf course and other recreational facilities. In 2007, Milan applied to the City to develop a residential subdivision on the golf course portion of the Property. Dubbed "Ridgeline Equestrian Estates," the proposed development consists of 39 homes, each built on a one-acre lot, plus various equestrian amenities (the Project).

The City of Orange City Council (the City Council) ultimately approved the Project in 2011. In connection therewith, the City Council adopted a resolution

amending the City's general plan (General Plan Amendment). Among other things, the General Plan Amendment changed the existing designation of the Property on the general plan land use policy map (Policy Map) from "Open Space" to "Other Open Space & Low Density." In response to petitioning activity by its citizens, the City held a referendum on the General Plan Amendment.[1] On November 6, 2012, participating voters defeated Measure FF, thereby nullifying the General Plan Amendment.

The petitioners, plaintiffs and appellants,[2] whom we shall refer to collectively as Orange Citizens, assert that the referendum essentially undid the City Council's approval of the Project. Orange Citizens' argument is straightforward: (1) a municipality's general plan must be consistent with any proposed development; (2) the City's general plan in 2010 was inconsistent with the Project, as reflected by the Policy Map designation of the Property ("Open Space"); (3) an amendment of the City's general plan was a necessary prerequisite for approval of the Project; and (4) the General Plan Amendment, which was the City Council's attempt to satisfy this necessary condition, failed at the ballot box. (See *Midway Orchards v. County of Butte* (1990) 220 Cal.App.3d 765, 783 [development agreement voided because project approval was inconsistent with general plan as it existed before a general plan amendment, which was made ineffective by referendum].)

---

[1] "The referendum is the means by which the electorate is entitled, as a power reserved by it under our state Constitution, to approve or reject measures passed by a legislative body." (*Empire Waste Management v. Town of Windsor* (1998) 67 Cal.App.4th 714, 717.) Amendments to general plans are legislative acts subject to referendum. (*Yost v. Thomas* (1984) 36 Cal.3d 561, 570.)

[2] Petitioners, plaintiffs and appellants include Orange Citizens for Parks and Recreation, a political action committee formed to protect the City's open space, and Orange Park Association, an incorporated association of citizens formed to protect the rural character of Orange Park Acres.

Milan, the City, and the City Council contend that the City's general plan since 1973 has always been to allow low density residential development on the Property. As repeatedly found by the City Council in connection with its approval of the Project, the City's general plan was *already* consistent with low-density residential units being constructed on the Property, even without the General Plan Amendment and notwithstanding the "Open Space" designation on the Policy Map. The General Plan Amendment simply corrected errors on the Policy Map (and in other documents). Regardless of whether these errors were corrected, the Project was consistent with the City's general plan. The trial court agreed with this position.

Because we conclude the City Council acted reasonably in making its consistency findings, we affirm the trial court's judgment with regard to denying Orange Citizens' petition for writ of mandate to set aside certain acts of the City Council (i.e., entering into a development agreement with Milan and changing the Property's zoning classification). We reverse the judgment with regard to the issuance of a writ of mandate commanding the City to remove the referendum from the ballot, a portion of the judgment already mooted by our previous stay of the trial court's writ of mandate.

GENERAL PRINCIPLES OF LOCAL PLANNING LAW

Before reciting the relevant facts and procedural history, we begin with an outline of the basic structure of local planning law. This divergence from our usual practice helps to illustrate the significance of the history of the City's planning efforts in Orange Park Acres.

The Planning and Zoning Law (Gov. Code, § 65000 et seq.)[3] channels and limits local governments' exercise of the police power under article XI, section 7 of the

_____

[3] All statutory references are to the Government Code unless otherwise stated.

4

California Constitution. (See *Fonseca v. City of Gilroy* (2007) 148 Cal.App.4th 1174, 1181-1182.) City councils and county boards of supervisors (i.e., local "legislative bod[ies]") possess a "planning agency with the powers necessary to carry out the purposes" of the Planning and Zoning Law. (§ 65100; see 1 Cal. Land Use Practice (Cont.Ed.Bar. 2010) Overview of Land use Regulations, § 1.20, p. 19.) Each "legislative body . . . shall by ordinance assign the functions of the planning agency to a planning department, one or more planning commissions, administrative bodies or hearing officers, the legislative body itself, or any combination thereof, as it deems appropriate and necessary." (§ 65100.) In the case before us, the relevant legislative body is the City Council, which apparently assigned some of its planning agency powers to the City of Orange Planning Commission (Planning Commission).

Putting to one side the question of federal or state preemption of local planning authority, the hierarchy of local land use regulation is structured from top to bottom to include: (1) the general plan; (2) any specific plan(s); (3) the zoning code; (4) specific relief from the zoning code — e.g., conditional use permits or variances; (5) subdivision maps; and (6) building permits. (1 Land Use Practice, *supra*, Overview of land use Regulation, § 1.12, p. 14.)

*General Plans*

"Each planning agency shall prepare and the legislative body of each county and city shall adopt a comprehensive, long-term general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning." (§ 65300; see *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 535 (*Lesher*) ["The Planning and Zoning Law . . . [citation] mandates the adoption of a general plan by every city and every county in this state"], fn. omitted.) The general plan adopted by a legislative body is "a '"constitution" for future development' [citation] located at the top

5

of 'the hierarchy of local government law regulating land use' [citation]." (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 773 (*DeVita*).) "The planning law . . . compels cities and counties to undergo the discipline of drafting a master plan to guide future local land use decisions." (*Ibid*.)

"The general plan shall consist of a statement of development policies and shall include a diagram or diagrams and text setting forth objectives, principles, standards, and plan proposals." (§ 65302.) "The plan must include seven elements — land use, circulation, conservation, housing, noise, safety and open space — and address each of these elements in whatever level of detail local conditions require [citation]." (*DeVita*, *supra*, 9 Cal.4th at p. 773.) The land use element "designates the proposed general distribution and general location and extent of the uses of the land for housing, business, industry, open space, including agriculture, natural resources, recreation, and enjoyment of scenic beauty, education, public buildings and grounds, solid and liquid waste disposal facilities, and other categories of public and private uses of land." (§ 65302, subd. (a).) The open space element requires a "local open-space plan for the comprehensive and long-range preservation and conservation of open-space land within its jurisdiction." (§ 65563.) "'Open-space land' is any parcel or area of land or water that is essentially unimproved and devoted to an open-space use as defined in this section, and that is designated on a local, regional or state open-space plan as any of the following: [¶] (1) Open space for the preservation of natural resources . . . . [¶] (2) Open space for the managed production of resources . . . . [¶] (3) Open space for outdoor recreation . . . ." (§ 65560, subd. (b).)

"The general plan may be adopted in any format deemed appropriate or convenient by the legislative body, including the combining of elements." (§ 65301, subd. (a).) "The general plan may be adopted as a single document or as a group of documents relating to subjects or geographic segments of the planning area." (*Id*., subd. (b).) "[T]he Legislature intends that the general plan and elements and parts

6

thereof comprise an integrated, internally consistent and compatible statement of policies for the adopting agency." (§ 65300.5.)

"If it deems it to be in the public interest, the legislative body may amend all or part of an adopted general plan." (§ 65358, subd. (a); see *Lesher*, *supra*, 52 Cal.3d at pp. 538-539 [describing procedural requirements of adoption or amendment of general plan].) Whether a city or county is adopting a new general plan or amending an existing general plan, it must conduct public hearings (§§ 65351, 65355) and "refer the proposed action to" certain interested public entities (§ 65352, subd. (a)). "The planning commission shall make a written recommendation on the adoption or amendment of a general plan." (§ 65354.) "The legislative body shall adopt or amend a general plan by resolution, which resolution shall be adopted by the affirmative vote of not less than a majority of the total membership of the legislative body." (§ 65356.) "Copies of the documents adopting or amending the general plan, including the diagrams and text, shall be made available to the general public" to inspect or to keep for a reasonable fee. (§ 65357, subd. (b)(1)(2).)

*Specific Plans*

"After the legislative body has adopted a general plan, the planning agency may, or if so directed by the legislative body, shall, prepare specific plans for the systematic implementation of the general plan for all or part of the area covered by the general plan." (§ 65450.) "A specific plan shall be prepared, adopted, and amended in the same manner as a general plan, except that a specific plan may be adopted by resolution or by ordinance and may be amended as often as deemed necessary by the legislative body." (§ 65453, subd. (a).)

Specific plans include many of the same features as general plans. (§ 65451, subd. (a).) "The specific plan shall include a statement of the relationship of the specific plan to the general plan." (*Id.*, subd. (b).) "No specific plan may be adopted

7

or amended unless the proposed plan or amendment is consistent with the general plan." (§ 65454.) "Any specific plan or other plan of the city or county that is applicable to the same areas or matters affected by a general plan amendment shall be reviewed and amended as necessary to make the specific or other plan consistent with the general plan." (§ 65359.)

*Zoning Law*

"The legislative body of any county or city may . . . adopt ordinances that do any of the following: [¶] (a) Regulate the use of buildings, structures, and land as between industry, business, residences, open space, including agriculture, recreation, enjoyment of scenic beauty, use of natural resources, and other purposes." (§ 65850.) "For such purposes the legislative body may divide a county, a city, or portions thereof, into zones of the number, shape and area it deems best suited to carry out the purpose of" the zoning law. (§ 65851.) "All such regulations shall be uniform for each . . . use of land throughout each zone, but the regulation in one type of zone may differ from those in other types of zones." (§ 65852.)

"County or city zoning ordinances shall be consistent with the general plan . . . ." (§ 65860, subd. (a).) "A zoning ordinance that is inconsistent with the general plan is invalid when passed [citations] and one that was originally consistent but has become inconsistent must be brought into conformity with the general plan. [Citation.] The Planning and Zoning Law does not contemplate that general plans will be amended to conform to zoning ordinances. The tail does not wag the dog. The general plan is the charter to which the ordinance must conform." (*Lesher*, *supra*, 52 Cal.3d at p. 541.)

*Approval of Development Projects*

"'[T]he propriety of virtually any local decision affecting land use and development depends upon consistency with the applicable general plan and its elements.'" (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 570.) "The consistency doctrine has been described as 'the linchpin of California's land use and development laws; it is the principle which infuse[s] the concept of planned growth with the force of law.'" (*Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 994.) "A project is consistent with the general plan '"if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment."'" "A given project need not be in perfect conformity with each and every general plan policy. [Citation.] To be consistent, a subdivision development must be 'compatible with' the objectives, policies, general land uses and programs specified in the general plan." (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1336.)

"A development agreement shall not be approved unless the legislative body finds that the provisions of the agreement are consistent with the general plan and any applicable specific plan." (§ 65867.5, subd. (b).) "No local agency shall approve a tentative map . . . unless the legislative body finds that the proposed subdivision, together with the provisions for its design and improvement, is consistent with the general plan . . . or any specific plan . . . ." (§ 66473.5.)

## FACTS

Orange Park Acres is a neighborhood in Orange County with a semi-rural character, exemplified by large lot sizes and equestrian activities. Portions of Orange Park Acres are located within the City, while the remainder is unincorporated land within the jurisdiction of the County of Orange.

9

The Project is sited at the Property (51.1 acres located within Orange Park Acres that once featured a golf course, tennis courts, and a clubhouse). In addition to 39 acres of residences, the Project provides for a 2.3 acre equestrian arena and new equestrian trails. Since 1985, the entire Property has been part of the City. But the City exercised its planning authority over the Property even earlier, as the Property fell within the City's "sphere of influence." (See *Merritt v. City of Pleasanton* (2001) 89 Cal.App.4th 1032, 1034; §§ 65300, 65859, subd. (a).)

The question presented in this case appears deceptively simple: Is the development of low-density residential estates on the Property consistent with the City's general plan? But a review of the voluminous administrative record in this case reveals contradictions and ambiguities that call into question the possibility of definitively determining the land use designation of the Property in the general plan.

*The City's Adoption of a Plan for Orange Park Acres in 1973*

On May 16, 1973, a development committee for Orange Park Acres was established to address controversies arising between stakeholders in the community. The committee included members representing the City, the county, residents of Orange Park Acres, major landowners, and real estate developers. The committee collected information, set objectives, and evaluated competing policies. The area under study included 594 acres within the City and 1127 acres within unincorporated Orange County.

The tangible product of the committee's work was a September 1973 document entitled "Orange Park Acres Specific Plan."[4] After detailing information about Orange Park Acres that had been gathered and discussing several alternative concept

_____

[4] Although the document referred to itself as a "specific plan," there is no discussion within the document as to whether it was intended to be a statutory "specific plan" under section 65450.

plans, the document set forth a "Proposed Specific Plan." The proposed plan listed goals, objectives, and policies to preserve and enhance the community. The concept of the "Specific Plan" was to mix low-density, one acre residential lots with clusters of denser single-family housing. The "Orange Park Acres Specific Plan" also sought to preserve existing and establish new open space, including trails, parks, hillside slopes, and greenbelts.

As for the Property, "The Plan advocates the permanent retention of the 34 acre golf course within Orange Park Acres. If the private ownership cannot sustain a [viable] economic return, public acquisition is suggested in order to preserve a substantial amenity for recreation and open space within the area."[5] "In addition to the golf course, there is a four acre Tennis Club and the seven acre . . . Country Club to be sustained with the proposed Plan." The "Orange Park Acres Land Use and Circulation Plan," a map included in the proposed plan, designated the Property as "Golf Course" (the golf course portion) and "Local Parks" (the remainder of the Property) within the "Open Space & Recreation" category of uses.

On November 19, 1973, the Planning Commission held a public hearing to consider the adoption of the "Orange Park Acres Plan as a part of the land use element of the General Plan encompassing a portion of incorporated territory and unincorporated territory in the General Planning Area of the City . . . ." By Resolution No. PC-85-73, the Planning Commission recommended the adoption of the "Orange Park Acres Plan," although the Planning Commission disapproved of the circulation element and added several amendments. In adopting the resolution, the Planning Commission found that "the Orange Park Acres Plan meets General Plan criteria set forth in Section 65302[, subdivision ](a) . . . . Sections 65352 and 65357 further authorize the Planning

---

[5] It is worth noting that this language does not purport to require the permanent retention of the golf course or public acquisition of the Property, only to suggest it.

11

Commission and legislative body to adopt General Plan elements and amendments for all or a portion of a city and a surrounding planning area by resolution . . . ." The Planning Commission further resolved to direct its staff "to prepare implementation ordinances or resolutions . . . consistent with this resolution and the Orange Park Acres Plan."

One of the Planning Commission's proposed amendments was to "[d]esignate the Golf Course as Other Open Space and Low Density (1 acre)." James A. Jackman, who was a member of the Orange Park Acres committee and the City Council at the time, provided insight into the purpose of this amendment at a May 2011 public hearing: "The concern of the committee at that time was really what happens if the golf course no longer is the function of the golf course? What are we to do next? And the answer was we were worried that it would be developed as commercial which was inconsistent with the . . . large parcel of land right in the center of Orange Park Acres, right in the very heart of the area that we were planning and we said it has to be the one-acre estates." Jackman added that the 2011 City Council had "an opportunity to put in a development that we [the 1973 City Council] would have, in my opinion, have approved in a heartbeat had it come before us back in 1973, had the golf course wanted to go out at that time."

On December 26, 1973, the City Council adopted Resolution No. 3915, which resolved to uphold the recommendation of the Planning Commission to adopt and approve the "General Plan for the Orange Park Acres area . . . as set forth in that certain plan . . . dated September 1973 *and as amended by the Planning Commission* on November 19, 1973 . . . as a part of the land use element of the City . . . and that copies of this plan be maintained on file . . . in order that this plan may be readily accessible to members of the public." (Italics added.) Resolution No. 3915 did not explicitly set forth the text of the amendments added by the Planning Commission. Resolution No. 3915 made findings that the Orange Park Acres plan met the requirements of a general plan

12

under the Government Code and was to be considered "part of the required land use element to be included in a General Plan for the City . . . ."

In sum, as of December 1973, the Planning Commission and City Council had resolved to include the amended Orange Park Acres plan as part of the City's general plan. The relevant amendment for our purposes is the designation of the golf course portion of the Property as "Other Open Space and Low Density (1 acre)." But the record does not include a copy of the Orange Park Acres plan or a general plan map from the 1970's reflecting this amended designation of the Property. It may be, as speculated by the City in an environmental planning document prepared in connection with the Project, that "the textual changes recommended by the Planning Commission and approved by the City Council were never entered into any official copy of the" Orange Park Acres plan. Milan's attorney acknowledged in a May 2011 letter to the City Council that the copy of the Orange Park Acres plan readily available to the public (at least in 2011) "includes the City Council's adopting resolution from 1973 which reflects incorporation of the Planning Commission's changes, but does not include the Planning Commission's recommended changes to the text which were adopted by the City Council." In other words, the *draft* Orange Park Acres plan and resolution No. 3915 were presented in recent years to the public as the Orange Park Acres plan, but actual language designating the Property as "Other Open Space and Low Density (1 acre)" was not.

*Subsequent Planning Activities*

In January 1977, the City Council resolved to delete the word "'specific' from the text of the Orange Park Acres Area Plan." It is unclear from the record how this resolution was (or was not) actually implemented with regard to copies of the Orange Park Acres plan from 1977 to the present.

In October 1977, the City Council resolved to change the zoning classification for the clubhouse portion of the Property from its county zoning

13

designation, "County E4-1 zoning (Single Family Residence, one acre minimum lot size)," to "City R-O (Recreation-Open Space)." The resolution indicated this change was necessary" to permit use of the property as a clubhouse." According to the resolution, the "zone change is consistent with the Orange Park Acres General Plan." Apparently, the City and the owner of the clubhouse property had agreed that the City would annex the clubhouse portion of the Property.

In September 1985 the City Council resolved to annex the "Ridgeline Country Club" portion of the Property at the request of the property owner. According to an analysis prepared by the County of Orange Local Agency Formation Commission, "[a] portion of the country club is already within the city limits of Orange, and the landowner desires to have all the property under one jurisdiction to provide uniform development standards to all the property." The application itself, in response to a question about the general plan land use designations, stated that the County of Orange designation was "Residential" while the City designation was "Recreation/Open Space." The application stated that the current and proposed use for the land was a golf course and tennis club, and that the proposed zoning was R-O (Recreation-Open Space). The Local Agency Formation Commission letter stated: "The subject territory is developed with a golf course and tennis club. There are no residents onsite. Current zoning on the site is County E4-1 (Small Estates). The landowner has filed an application with the City of Orange to re-zone the property R-O (Recreation Open Space) which is consistent with the existing use and the city's General Plan for the site. [¶] The site is surrounded by single family residences."

In October 1985, the City Council resolved to reclassify the entirety of the Property's zoning to R-O (Recreation-Open Space). Prior to the City's annexation and rezoning of the Property, multiple parcels on the Property had inconsistent zoning designations. This resolution also indicated the following facts had been established: "The configuration of the proposed parcels would increase the potential for development

14

to other than recreation oriented uses, but it is noted that, at a minimum, *a General Plan Amendment* and Zone Change *would be required to allow other uses*."  (Italics added.)  In noting this alleged fact, the resolution is at odds with the notion that the general plan in effect designated the Property "Other Open Space and Low Density (1 acre)."

In July 1989, the City Council resolved to amend the Orange Park Acres plan.  This resolution did not pertain to the Property, but included a finding of fact relevant to the dispute before us:  "That although the Orange Park Acres Plan labels itself as a 'specific plan', it does not contain the level of detail required of a Specific Plan under state law . . . .  Therefore due to its contents, and the manner in which it was adopted, the [Orange Park Acres] Plan has the authority of a General Plan, rather than a Specific Plan."

*1989 General Plan*

The City Council adopted by resolution a new general plan in August 1989.  In the introduction to this general plan, it was noted that the City's existing general plan was "outdated" and that a new general plan was required "to bring the Plan up to date and to establish definitive land use and development policy to guide the City into the next century."

The 1989 general plan stated that its "Land Use Element and the Land Use Policy Map are the most important components of the General Plan."  "Through the use of text and diagrams, the Land Use Element establishes clear and logical patterns of land use as well as standards for new development.  The single most important feature of this element is the Land Use Policy Map.  This map, a copy of which is contained in the back pocket of the General Plan, indicates the location, density and intensity of development for all land uses city-wide."  The 1989 general plan's Policy Map included an "OS GOLF" (i.e., open space, golf) notation on the Property.

15

The 1989 general plan also referenced "other plans and programs that need to be considered in the formulation, adoption and implementation of land use policy." These other plans included "[t]wo additional land use plans . . . for the unincorporated areas located in the eastern portion of the City. The Orange Park Acres plan was prepared in 1973. This plan outlines land use policy for the semi-rural Orange Park Acres area . . . ." The Orange Park Acres plan was classified as an "Area Plan." The 1989 general plan clearly does not deem the Orange Park Acres plan to be a "specific plan," but it also does not explicitly reaffirm that the Orange Park Acres plan remains a part of the City's general plan.

A mere eight months later, the City Council (in a resolution amending the Orange Park Acres plan) stated that the Orange Park Acres plan "is part of the Land Use Element of the City's General Plan . . . ." Similarly, in July 1998, the City Council observed in a resolution approving a conditional use permit that "the proposed project is consistent with the City's General Plan and, more specifically, the Orange Park Acres Plan, which was adopted as part of the City's General Plan . . . ." But in September 2000, October 2003, and August 2008, the City Council adopted resolutions which referred to the "Orange Park Acres Specific Plan." The October 2003 resolution was billed as a *general plan amendment* to, in part, remove certain land from the scope of the Orange Park Acres *Specific Plan*.

By way of review, there was a certain amount of ambiguity in the land use classification of the Property from the inception of the Orange Park Acres plan in 1973. The proposal provided for an open space designation. Upon recommendation of the Planning Commission, the City Council adopted an amended Orange Park Acres plan by resolution. But the amendment designating the Property as Open Space *or* low-density residential was (perhaps) never reflected in the maps or text associated with the Orange Park Acres plan, but (perhaps) only ever appeared in the Planning Commission resolution

16

(Resolution No. PC-85-73) referenced by the City Council in its own Resolution No. 3915 adopting the Orange Park Acres plan as amended.

Until the Project and the controversy surrounding it, apparently no explicit attempt was ever made by the City Council to clear up the ambiguity in its planning documents. Indeed, matters only grew more confused. The zoning changes to the Property as part of its annexation in the late 1970's and 1980's reflected only the open space component of the dual open space/low density residential designation of the Property by the City Council in 1973. Was this simply a reflection of the current owner's use or did these zoning designations reflect a belief on the part of the City Council that open space was the only use consistent with the then-existing general plan? The updated 1989 general plan did not explicitly reference the Orange Park Acres plan as a continuing part of the general plan. Some subsequent City Council resolutions stated that the Orange Park Acres plan was still part of the general plan, but other resolutions refer to the Orange Park Acres Specific Plan. And even assuming the Orange Park Acres plan was still part of the general plan, the 1989 Policy Map explicitly classified the Property as OS (Open Space)/Golf. To the extent the pre-1989 general plan allowed low-density single family residential development, did the 1989 general plan (and in particular the Policy Map) amend the general plan to limit the Property to open space uses?

*2010 General Plan*

In March 2010, the City adopted yet another general plan. The 2010 general plan applied to all of Orange and its eastern sphere of influence, including Orange Park Acres. In an introductory section, the 2010 general plan observed with regard to Orange Park Acres that "most of the area was annexed by the City . . . during the 1990s." The 2010 Policy Map designated the Property as "OS" (Open Space). "Open Space" was defined elsewhere in the 2010 General Plan to refer to "[s]teep hillsides, creeks, or environmentally sensitive areas that should not be developed."

17

The 2010 general plan listed "Orange Park Acres" as one of the "Specific Plans and Neighborhood Plans" that were "currently in effect."  In contrast, the Orange Park Acres plan is not listed among the "[a]dopted Specific Plans and Neighborhood Plans" in another section of the document.  Instead, the text states "[e]arlier planning efforts that have influenced the growth and change within Orange include the . . . Orange Park Acres development plan."  In an implementation index, however, the 2010 General Plan states it should "[c]ontinue to implement and update, as needed," the Orange Park Acres Plan and other specific plans and neighborhood plans.

*Milan's Application to Develop the Project*

In 2007, Milan submitted an application to the City to develop the Project at the Property.  The application requested "[t]he approval of a General Plan Amendment, Development agreement, Change of Zone, Specific Plan Amendment, Tentative Tract Map, Parcel Map, Master Site Plan, and [California Environmental Quality Act] documents to allow the construction of" the Project.  An initial study prepared pursuant to the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) stated that Milan requested a general plan amendment to designate the Project site as "Estate Residential" on the Policy Map.  The initial study also stated that Milan requested an amendment to the "Orange Park Acres Specific Plan Map" to designate the Project site as "Low Density — One Acre Minimum."

Similarly, a 2009 draft environmental impact report prepared pursuant to CEQA described and illustrated (by showing the existing and proposed general plan and zoning designations on maps of the Property and its surrounding environs) the changes to the general plan and Orange Park Acres Specific Plan under consideration.  This document stated that "[a]lthough the proposed project is inconsistent with the existing City General Plan land use designation for the project site, upon approval of a General Plan Amendment it would be in substantial compliance with the Land Use Element Goals

18

and Policies. The proposed General Plan Amendment would amend the Land Use Element Map to designate the proposed project site as Estate Density Residential."

The Project generated considerable controversy, based in part on its replacement of open recreational space with a private residential subdivision.

Sometime in 2009, Milan's counsel presented the City's attorney, David DeBerry (City Attorney), with the 1973 resolutions described above (i.e., Planning Commission Resolution No. PC-85-73 and City Council Resolution No. 3915). In response, the City Attorney conducted a full review of the City's planning history pertaining to the Property. On December 22, 2009, based on his review, the City Attorney transmitted a letter to interested parties with two findings: (1) "The [Orange Park Acres] Plan is a part of the land use element of the City"; and (2) "The [Orange Park Acres] Plan designates the golf course portion of the [Property] as 'Other Open Space and Low Density (1 acre).' As such, [the Project] would be consistent with the Plan's designation of the [P]roperty, although somewhat inconsistent with other aspects of the Plan." The City Attorney later speculated that the "best explanation" for the confusion and inconsistencies in the City's planning history is "the action taken in 1973 was forgotten."

A June 2010 Planning Commission memorandum described the state of affairs as discerned by the City's Planning Manager: "the [Orange Park Acres] map does not accurately depict the designation as 'Other Open Space and Low Density (1 acre)' as approved by the City Council in 1973. Since the [Orange Park Acres] map was not updated after the City Council action, the City's General Plan Land Use Map reflects the [Orange Park Acres] Plan as it is shown currently. One of the proposed actions before the City is to formally amend the [Orange Park Acres] Plan and General Plan to ensure consistency with the proposed project."

Milan agreed with this analysis. Even after the discovery of this lost history, Milan proposed a general plan amendment to "reflect the proper land use

19

designation for the Project site, to remove incorrect descriptions of the [Orange Park Acres] Plan such as 'specific plan' or 'neighborhood plan,' and to properly reflect the [Orange Park Acres] Plan. If the General Plan is so amended, the Project will be entirely consistent with the General Plan and 100% approvable . . . ." Orange Citizens, on the other hand, disagreed with the entire notion that the 1973 Orange Park Acres plan had anything to do with the City's General Plan as it existed in 2007 through 2011.

*Project Approval*

By a July 2010 resolution, the Planning Commission recommended that the City approve the Project by certifying the final environmental impact report, adopting its findings of fact, adopting a statement of overriding considerations, approving a general plan amendment, and approving a zone change for the Property. As to the general plan amendment, the Planning Commission noted it was recommending that the City Council *deny* Milan's proposal to change the land use designation of the Property in the general plan. Instead, the Planning Commission recommended that the City Council maintain the "existing land use designation of 'other open space and low density (1 acre).'"

On June 14, 2011, the City Council adopted a series of resolutions amounting to its approval of the Project. Resolution No. 10566 adopted the General Plan Amendment. The title of the resolution "AFFIRMS THE SITE'S EXISTING LAND USE DESIGNATION OF 'OTHER OPEN SPACE AND LOW DENSITY (1 ACRE).'" The first recital of the resolution again "affirms the site's *existing* land use Designation of 'Other Open Space and Low Density (1 acre).'" (Italics added.) Resolution No. 10566 further states that the purpose of the General Plan Amendment is to "clarify the *original and unchanged terms* of the existing [Orange Park Acres] Plan" (italics added) and to "make the General Plan land use designations for the subject property consistent throughout the General Plan."

20

The General Plan Amendment itself, contained in an exhibit, revises the text and diagrams included within the City's General Plan, including the Orange Park Acres Plan. A new map establishing the Property as "Other Open Space & Low Density (1 ac)" is attached as part of the exhibit. The language recommending retention of the golf course was removed entirely from the Orange Park Acres plan. The land use and circulation plan map in the Orange Park Acres plan was changed from a golf course and local park designation to a low-density, one acre minimum lot designation. The General Plan Amendment also allowed vinyl fencing (as opposed to only wood fencing) and updated land use statistics detailed in the original Orange Park Acres plan.

Resolution No. 10566 found with regard to the consistency of the Project with the City's General Plan: "Upon approval of the proposed amendments to the General Plan, the project is consistent with the goals and policies of the City's General Plan that was approved by the City Council on March 9, 2010, including the [Orange Park Acres] Plan as 'part of the required land use element to be included in a General Plan for the City of Orange.' . . . The existing Other Open Space and Low Density (1 acre) General Plan Designation is consistent with the project and the General Plan, as textually amended because the open space and residential designation is consistent with residential one acre lots."

A second resolution certified the final environmental impact report for the Project. As part of this resolution, the City Council adopted certain findings of fact. We list particularly relevant findings. "[A]t the time of the adoption of the [Orange Park Acres] Plan, it was not the intent of the City Council to prohibit residential development on the Property, but rather the very specific intent that one-acre residential lots be permitted on the Property." "As adopted in 1973, the [Orange Park Acres] Plan specifically permitted low density residential uses on minimum one-acre lots on the Project site." "The [Orange Park Acres] Plan was adopted by the City in 1973 as a part of the Land Use Element of the City's General Plan. Although since its original

21

adoption, various City documents have incorrectly referred to the [Orange Park Acres] Plan as a specific plan, community plan, and/or area plan, the official records of the City clearly establish that the [Orange Park Acres] Plan was adopted only as part of the Land Use Element of the General Plan. There is no evidence that the City has ever adopted (as opposed to incorrectly referenced) the [Orange Park Acres] Plan as anything other than part of the City's General Plan." "The Record indicates that, most likely through clerical oversight and contrary to the express terms of Resolution No. 3915, the textual changes recommended by the Planning Commission and approved by the City Council were never entered into any official copy of the [Orange Park Acres] Plan." "In approving [General Plan Amendment] 2007-0001, it is the intent of the City Council to exercise its legislative discretion to honor the intent of the original adoption of the [Orange Park Acres Plan], remove any uncertainty pertaining to the permitted uses of the Property, and allow uses on the Property which the City Council believes to be appropriate." "The City's existing zoning classification for the Property (RO) excludes residential land use as a permitted use. Changing the zoning of the Project Site from RO to R-1-40 is consistent with the 1973 [Orange Park Acres] Plan Land Use designations and the land use designations adopted by the City Council's approval of [General Plan Amendment] 2007-001. Therefore, the R-1-40 zoning is consistent with the City's General Plan."

A third resolution approved a tentative tract map for the Project. This resolution found the tentative tract map to be "consistent with the City of Orange General Plan which includes the Orange Park Acres Plan as part of the Land Use Element . . . ." These June 14, 2011 resolutions were voted on by four of the five City Council members who adopted the 2010 General Plan.

On July 12, 2011, the City Council passed an ordinance changing the zoning classification for the Property from "Recreation/Open Space to Residential 43,560 square feet (R-1-40)." The City Council found this zone change was "consistent with and furthers the objectives and policies of the Orange Park Acres Plan, which is part of the

22

land use element of the General Plan, as amended by General Plan Amendment 2007-0001 . . . ." Also on July 12, 2011, the City Council passed an ordinance approving a development agreement with Milan, which was also deemed to be "consistent with the objectives, policies, general land uses, and programs specified in . . . the General Plan, as amended by General Plan Amendment 2007-0001, which General Plan includes the Orange Park Acres Plan as part of its land use element."

*Referendum*

On July 12, 2011, Orange Citizens for Parks and Recreation submitted to the City Clerk a referendum of Resolution No. 10566 (adopting the General Plan Amendment). On August 1, 2011, the County Registrar certified that sufficient signatures had been submitted to qualify the referendum for the ballot. On September 6, 2011, the City Council placed the referendum on the ballot for the November 6, 2012 election. Jumping ahead in the story, on November 6, 2012, the voters of the City defeated Measure FF, thereby nullifying Resolution No. 10566.

*Litigation*

On July 26, 2011, Milan filed a petition for writ of mandate and complaint for injunctive and declaratory relief, by which Milan sought to stop the referendum of Resolution No. 10566 from proceeding due to alleged improprieties in the signature-gathering process.[6]

In October 2011, Orange Citizens filed a cross-petition for writ of mandate and cross-complaint for declaratory relief seeking to set aside the zone change and

---

[6] Mary E. Murphy, the City Clerk, and Neal Kelley, Registrar of Voters for the County of Orange, were named as respondents and defendants. Orange Citizens for Parks and Recreation was named as the real party in interest.

23

development agreement as inconsistent with the City's General Plan.[7] Specifically, Orange Citizens contended that the referendum suspended the effectiveness of the General Plan Amendment, and that without the General Plan Amendment, the City's general plan designates the Property as open space.

Milan responded with another petition for writ of mandate and cross-complaint for declaratory relief, specific performance, and injunctive relief.[8] By this pleading, Milan sought to establish it was entitled to proceed with the Project regardless of the outcome of the referendum because the Project was consistent with the general plan even without the General Plan Amendment. Milan contended the Project was authorized and supported by the original designation of the Property as "Other Open Space and Low Density (1 Acre)" in 1973. Alternatively, Milan asserted that repeal of the General Plan Amendment would be improper and legally void because it would create an internally inconsistent general plan.

In January 2012, the parties stipulated to bifurcate and sever pleadings and causes of action in an effort to obtain a speedy resolution of certain time sensitive issues. The stipulation indicated Orange Citizens' cross-petition and four of the causes of action in Milan's petition and cross-complaint were severed and bifurcated for a one-day bench trial based on the administrative record and trial briefs. The court heard argument on the bifurcated claims in March 2012.

*Trial Court's Ruling*

On May 7, 2012, the court issued a three-page minute order explaining its ruling in favor of Milan. The court did not explicitly defer to any of the City Council's

---

[7] The City and the City Council were named as cross-respondents and cross-defendants. Milan was named as the real party in interest.

[8] The City, the City Council, and Neal Kelley were named as respondents and cross-defendants to this pleading.

findings. "Here, there is little question the City intended the [Orange Park Acres] Plan to be incorporated into the City's general plan. The various City Council resolutions make that clear. It is equally clear that the [Orange Park Acres] Plan designates the . . . Project site as 'Other Open Space and Low Density (1 acre.) While it is true that subsequent resolutions and general plan documents describe the property as 'open space,' none of these documents were sufficient to officially amend the original designation as set forth in the [Orange Park Acres] Plan. They were, simply, inaccurate designations. . . . The fact that the [Orange Park Acres] Plan was created over forty years ago is irrelevant. Land use planning is long range planning designed to control development for years to come."

"The [General Plan Amendment] did not attempt to change the land use designation established in the [Orange Park Acres] Plan. Instead, its chief purpose was to correct errors that occurred over the years in describing the land use designation for the . . . Project and clarify that the . . . Project was indeed designated as low density. Thus, even if the voters reject the [General Plan Amendment], the designation remains the same. The record will simply continue to contain inconsistent and confusing references to the property being designated open space. For that reason, the developer and the City do not have to await the outcome of the referendum to begin the project."

On June 19, 2012, the court issued a peremptory writ of mandamus addressed to the City and the City Council. The writ commanded the City and City Council to rescind applicable resolutions and "remove the referendum regarding the General Plan Amendment from the November 6, 2012 election ballot." The writ further commanded the City and City Council to permit Milan to develop the Property "in accordance with the actual and original General Plan designation of the property as 'Other Open Space and Low Density (1 Acre), and the Development Agreement, and all other applicable requirements of the City."

25

On July 9, 2012, the court entered judgment on the claims before it at the March 2012 trial. In addition to ordering issuance of the writ of mandate, judgment was entered in favor of Milan and the City (and City-affiliated parties) and against Orange Citizens on all causes of action at issue.

*Court of Appeal Writ and Appellate Proceedings*

On June 8, 2012, Orange Citizens filed with this court a petition for writ relief, including an immediate stay of the court's May 7 minute order. Orange Citizens requested a peremptory writ of mandate directing the trial court to: (1) vacate its May 7 minute order; (2) restore the referendum to the November 6, 2012 ballot; and (3) enter judgment in favor of the Orange Citizens and against Milan on all claims at issue. Orange Citizens subsequently submitted a copy of the trial court's peremptory writ of mandamus, of which this court took judicial notice.

On July 12, 2012, we issued an order to show cause why mandate or other appropriate relief should not issue. We also granted Orange Citizens' request for a stay of the court's May 7 order and the resulting peremptory writ of mandate.

On July 26, 2012, Orange Citizens filed a notice of appeal of the July 9 judgment. On August 9, 2012, we consolidated the appeal with the writ petition for all purposes.

DISCUSSION

So what is the City's general plan with regard to the land use designation of the Property, without reference to the General Plan Amendment (which was voted down by referendum)? And is the general plan consistent with the Project? There are three possibilities advanced by the parties.

First, as asserted by Orange Citizens, the general plan allows only open space uses at the Property. A general plan amendment is necessary to change the

26

designation of the Property from open space to low density residential. To reach this conclusion, one must simply review the 2010 Policy Map adopted by the City Council as part of the 2010 general plan, which designates the Property as "Open Space." There is no need to revisit ancient history. And even if one ventures into out-of-date planning records (e.g., the 1989 general plan, the Orange Park Acres plan), there is no general plan map or any other post-1973 document in the extant records authorizing development of the Property for use as residences. In sum, the general plan consists of the most recent *objective* evidence of the general plan (i.e., text and diagrams presented to the public as the general plan), not some long forgotten remnant of days past.

Second, as argued by Milan and the City, the general plan allows low density residences on the Property. A general plan amendment was unnecessary to approve the development agreement, zone changes, environmental impact report, and subdivision map. Thus, the Project can go forward despite the referendum. This conclusion vindicates the original intent of the City Council that adopted the Orange Park Acres plan in 1973. As adopted, the Orange Park Acres plan authorized low density residential development on the Property. Although various "clerical errors" occurred through the years in the City's planning documents (which could lead an uninformed observer to infer that the Orange Park Acres plan was a specific plan and the Property could only be used as open space), no City Council ever intentionally reversed the legislative policy choice made by the 1973 City Council. Indeed, on repeated occasions, City Council resolutions have reaffirmed the continuing vitality of the Orange Park Acres plan as part of the general plan. (§ 65301, subd. (b) ["general plan may be adopted as a single document or as a group of documents relating to subjects or geographic segments of the planning area"].) And the Orange Park Acres plan (in contrast to the City's broader general plan) has never been comprehensively amended or specifically amended to restrict the Property to open space uses. It is easy enough to see how the errors designating the Property as "Open Space" may have occurred. The Property was largely

27

outside of the City's borders from 1973 to 1985. The Property was actually utilized as open space from 1973 until 2007, obviating the need for anyone to examine whether a residential use was acceptable under the general plan. The open space designation could have been copied from the proposed Orange Park Acres plan map to the 1989 Policy Map to the 2010 Policy Map, each time without consideration of the accuracy of prior designations. Ideally, of course, these mistakes would not have occurred. It should be easy for the public to determine what the general plan has to say about the uses allowed on a particular property. But general plans contain an enormous amount of information and policy maps cover wide stretches of real estate. When these sorts of mistakes inevitably occur, the *subjective intent* of the City Council should be honored over clerical errors manifested in planning maps.

Third, the general plan is hopelessly inconsistent and therefore indeterminate on the question of developing low density residences on the Property. Perhaps the Orange Park Acres plan is still part of the general plan and allows residential development on the Property. But the 2010 Policy Map allows only open space uses on the Property. Although it is clear what the 1973 City Council intended, it is impossible to divine what subsequent City Councils would have done had they explicitly considered Resolution No. 3915 (the 1973 City Council adoption of the Orange Park Acres plan as amended) and its effect on the land use designation of the Property on various general plan maps. This is Orange Citizens' fallback position; they contend internal inconsistency in a general plan necessitates an amendment to the general plan prior to the approval of a project affected by the inconsistency.

*Standard of Review*

The primary issue presented for our review is the question of whether the Project is consistent with the City's pre-General Plan Amendment general plan. By petition for writ of mandate, Orange Citizens challenged as inconsistent with the City's

28

general plan the July 12, 2011 decision of the City Council to approve a zone change and development agreement. Relatedly, Milan's first and fourth causes of action alleged the City acted correctly in approving the Project notwithstanding the pendency of the referendum.

The peripheral dispute is Milan's petition for writ of mandamus to invalidate the referendum on the grounds it would create an inconsistency in the City's general plan. This petition is in tension with Milan's position that the pre-amendment general plan is consistent with the Project. But as characterized in the parties' stipulation, this is an argument made in the "alternative[]."

"We review decisions regarding consistency with a general plan under the arbitrary and capricious standard. These are quasi-legislative acts reviewed by ordinary mandamus, and the inquiry is whether the decision is arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair. [Citations.] Under this standard, we defer to an agency's factual finding of consistency unless no reasonable person could have reached the same conclusion on the evidence before it." (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782.)[9] "'It is, emphatically, *not* the role of the courts to micromanage these development decisions.' [Citation.] Thus, as long as the City reasonably could have made a determination of consistency, the City's decision must be upheld, regardless of whether *we* would have made that determination in the first instance." (*California Native Plant Society v. City of Rancho Cordova* (2009) 172 Cal.App.4th 603, 638.) We review the City Council's decision and do not defer to the trial court. (*Id*. at p. 637.)

---

[9] Although the parties included causes of action for declaratory relief, specific performance, and injunctive relief in their pleadings, any remedies provided pursuant to these causes of action would necessarily be derivative of relief obtained via mandamus review of the City Council's acts.

29

"A court . . . cannot disturb a general plan based on violation of the internal consistency and correlation requirements unless, based on the evidence before the city council, a reasonable person could not conclude that the plan is internally consistent or correlative." (*Federation of Hillside & Canyon Assns. v. City of Los Angeles* (2004) 126 Cal.App.4th 1180, 1195; see § 65751 [action challenging general plan elements or internal consistency must be brought under Code Civ. Proc., § 1085, i.e., ordinary mandamus].)

Orange Citizens contend our review is de novo. De novo review is appropriate where the propriety of a land use decision turns on the correct interpretation of a statute. (See, e.g., *Harroman Co. v. Town of Tiburon* (1991) 235 Cal.App.3d 388, 392-393 (*Harroman*).) In *Harroman*, the dispute concerned whether an established general plan or a draft revised plan applied to a proposed project. (*Id*. at p. 390.) The contents of the established general plan and the draft revised plan were clear. It was also clear that the established general plan was consistent with the project but the draft revised plan was inconsistent with the project. (*Id*. at pp. 391-392.) The only question for the court was whether the legislative body had correctly determined that the Government Code dictated that a draft amended general plan applied to a pending project application. (*Id*. at pp. 392-393.) Here, we are reviewing the City's Council's determination of the contents of the City's general plan and its concomitant finding of the Project's consistency with that general plan. (See *No Oil, Inc. v. City of Los Angeles* (1987) 196 Cal.App.3d 223, 243, 247 [city council's "interpretation of its own land use document" and consistency finding can be reversed only if "a reasonable person could not have reached the same conclusion"].) Of course, to the extent we must interpret applicable statutes in assessing the reasonableness of the City Council's determination, we will not defer to the City Council's express or implied interpretations of those statutes.

Orange Citizens also claim we cannot defer to the City Council's consistency determination because the City Council actually limited its consistency

30

findings to the post-General Plan Amendment general plan. In approving the pertinent ordinances, the City Council referred to the general plan as amended by the General Plan Amendment.[10] Obviously, the City Council did not know at the time that Orange Citizens would succeed in defeating the General Plan Amendment by referendum. Because the voters voided the General Plan Amendment, there is no post-General Plan Amendment general plan to be consistent with the Project. But Orange Citizens ignores the City Council's repeated findings in multiple resolutions and the challenged ordinances that the Orange Park Acres Plan was part of the City's general plan and that the General Plan Amendment did not amend the land use designation of the Property, which remained low density residential (1 acre). Orange Citizens do not identify any of the other features of the General Plan Amendment as necessary for the Project to be found consistent with the general plan. Taken at face value, the City *did not amend* the land use designation of the Property by means of the General Plan Amendment. Thus, reference to the amended general plan does not negate any deference owed to the City Council's approval of the zone change and development agreement.

*The Merits: Composition of the General Plan and Its Consistency with the Project*

"[S]tate law does not require precise conformity of a proposed project with the land use designation for a site, or an exact match between the project and the applicable general plan. [Citations.] Instead, a finding of consistency requires only that

---

[10] The two ordinances actually challenged by Orange Citizens include the zone change and the approval of the development agreement. The City Council found the zone change was "consistent with and furthers the objectives and policies of the Orange Park Acres Plan, which is part of the land use element of the General Plan, as amended by General Plan Amendment 2007-0001 . . . ." The City Council found the development agreement to be "consistent with the objectives, policies, general land uses, and programs specified in . . . the General Plan, as amended by General Plan Amendment 2007-0001, which General Plan includes the Orange Park Acres Plan as part of its land use element."

31

the proposed project be '*compatible* with the objectives, policies, general land uses, and programs specified in' the applicable plan. [Citation.] The courts have interpreted this provision as requiring that a project be '"in agreement or harmony with"' the terms of the applicable plan, not in rigid conformity with every detail thereof." (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 678.)

Our comprehensive review of the record leads us to conclude that reasonable persons can disagree as to the actual composition of the City's general plan and its consistency with the Project. There is substantial evidentiary support for the City Council's finding that the City's general plan allowed low density residential development at the Property by way of the Orange Park Acres plan. And it logically follows that it was reasonable for the City Council to conclude the Project is consistent with the City's general plan as interpreted by the City Council.

This is not the end of our inquiry, however. Orange Citizens posit that, as a matter of law, the City's general plan does not include the Orange Park Acres plan and/or the low density residential designation.

### *The Alleged Lack of Implementation of the 1973 Amendment to the Orange Park Acres Plan Is Not Dispositive*

Orange Citizens first suggest the City Council's amendment of the proposed Orange Park Acres plan to allow low density residential development at the Property never became part of the City's general plan because it was never "implemented." Recall there was a Planning Commission resolution recommending this amendment, and the City Council resolution adopting the Orange Park Acres plan as part of the general plan included the recommended amendment. (§ 65356 ["The legislative body shall adopt or amend a general plan by resolution"].) But there is no evidence additional documentation was ever prepared by the City (e.g., a map or text added to the

32

Orange Park Acres plan) to accurately reflect the composition of the Orange Park Acres plan as adopted by the City Council (rather than as proposed by the committee).

Orange Citizens cite *City of Poway v. City of San Diego* (1991) 229 Cal.App.3d 847 (*Poway*) in support of its argument that "implementation" (and not merely a resolution under § 65356) is necessary to amend a general plan. *Poway* addressed a circumstance in which a legislative body's amendment of the general plan was not reflected in the publicly available version of the general plan. Pomerado Road connects areas of northeast San Diego County with the City of San Diego (San Diego). (*Poway*, at p. 852.) San Diego's general plan designated Pomerado Road as a "'major'" road. (*Id*. at pp. 852-853.) In 1987, San Diego annexed county land adjoining the City of Poway (Poway), through which ran a substandard portion of Pomerado Road. (*Id*. at p. 853.) San Diego's city council amended an applicable *specific plan* by resolution to allow for the closure of Pomerado Road, both until construction was completed to bring Pomerado Road up to San Diego standards *and* until an alternative route to Interstate 15, Scripps North Parkway, was constructed. (*Ibid*.) Subsequently, the San Diego city council passed an omnibus resolution incorporating 32 specific community plan amendments into San Diego's general plan, including the Pomerado Road closure amendment. (*Id*. at p. 854.) "Two maps attached to [this] resolution . . . showed the road, one designating it as an open major street." (*Ibid*.) "The copy of the general plan booklet available to the public does not show any amendment designating the road as closed." (*Id*. at p. 856.)

Pomerado Road construction was completed before the Scripps North Parkway was finished. (*Poway*, *supra*, 229 Cal.App.3d at pp. 853-854.) San Diego did not reopen the reconstructed portion of Pomerado Road at this time. (*Id*. at p. 854-855.) The closure of Pomerado Road negatively affected traffic flow in Poway. (*Id*. at p. 854.) Poway petitioned for a writ of mandate, arguing San Diego had a mandatory duty to reopen Pomerado Road. (*Id*. at p. 855.)

33

The trial court issued a writ of mandate in 1990. (*Poway*, *supra*, 229 Cal.App.3d at pp. 852, 855.) Based on the evidence before it, the trial court ruled that the specific plan amendment was insufficient to amend the general plan. (*Id*. at p. 855.) The text of the San Diego city council resolution, "the general plan amendment, disappeared from view and was not found until the time of the motion for new trial on the petition for writ of mandate." (*Id*. at p. 854, fn. 4.) The trial court denied San Diego's motion for new trial, which was based on its rediscovery of the city council resolution amending the general plan. (*Id*. at pp. 855-856.)

The appellate court affirmed on two independent grounds. First, it held that, regardless of the contents of its general plan, Vehicle Code section 21101, subdivision (f),[11] did not confer upon municipalities the right to close regionally significant streets or highways for merely parochial purposes (i.e., to reduce traffic for the benefit of the municipality's residents at the expense of outsiders). (*Poway*, *supra*, 229 Cal.App.3d at pp. 851-852, 864-867.) Second, the appellate court held that San Diego had not validly amended its general plan to allow for the closure, even if Vehicle Code section 21101 allowed it to close Pomerado Road under the pertinent circumstances. (*Poway*, *supra*, 229 Cal.App.3d at pp. 859-863.) Only this latter analysis is relevant to the case before us.

---

[11] "Local authorities, for those highways under their jurisdiction, may adopt rules and regulations by ordinance or resolution on the following matters": "(f) Prohibiting entry to, or exit from, or both, from any street by means of islands, curbs, traffic barriers, or other roadway design features to implement the circulation element of a general plan adopted pursuant to Article 6 (commencing with Section 65350) of Chapter 3 of Division 1 of Title 7 of the Government Code. The rules and regulations authorized by this subdivision shall be consistent with the responsibility of local government to provide for the health and safety of its citizens." (Veh. Code, § 21101, subd. (f).) Apparently, San Diego was authorized under Vehicle Code section 21367 to close Pomerado Road while construction was in progress. (*Poway*, *supra*, 229 Cal.App.3d at p. 861.)

The appellate court identified four shortcomings in San Diego's position (i.e., its general plan incorporated its specific plan amendment to close Pomerado Road until the completion of Scripps North Parkway): (1) the city council resolution incorporating the specific plan amendment was "never made available to the general public as required by . . . section 65357, subdivision (b)"; (2) the publicly available documents (i.e., the general plan booklet and maps) showed Pomerado Road to be open (*Poway*, *supra*, 229 Cal.App.3d at p. 862); (3) "[s]pecific plans must be consistent with general plans" under section 65454 (*id*. at p. 860); and (4) no additional amendments were passed to "implement" the general plan amendment (*Poway*, at pp. 862-863 ["Even though the general plan is always subject to change [citation], the material in the plan must have some current utility in order for the public to become informed of the current and projected land uses depicted in the plan"].) In sum, *Poway* provides some authority in support of the theory that publicly available documents are the basis for a general plan, not resolutions forgotten by the planning agency.

But *Poway* does not lead us to conclude the City Council acted arbitrarily or capriciously in this case. First, *Poway* applied a different standard of review. *Poway* reviewed the trial court's order granting the petition for writ of mandate and its order denying the motion for a new trial for an abuse of discretion. (*Poway*, *supra*, 229 Cal.App.3d at pp. 858-859.) We are reviewing the City Council's characterization of the contents of its own general plan and the consistency of the general plan with the Project. We will reverse the trial court only if the City Council's determinations were arbitrary, capricious, entirely lacking in evidentiary support, unlawful, or procedurally unfair.

Second, *Poway* is factually and procedurally distinguishable. In *Poway*, an amendment of the *specific plan* occurred by resolution, which was not sufficiently implemented by an effective amendment of the general plan. Here, the entire Orange Park Acres plan (including the amended designation of the Property) was adopted by resolution as part of the City's general plan. The City Council resolution adopting the

35

Orange Park Acres plan as amended was made available to the public. There was no specific plan inconsistency with the general plan in 1973; the Orange Park Acres plan was the City's general plan for Orange Park Acres. (§§ 65301, subd. (a) ["The general plan may be adopted in any format deemed appropriate or convenient by the legislative body, including the combining of elements"], 65301, subd. (b) ["The general plan may be adopted as a single document or as a group of documents relating to subjects or geographic segments of the planning area"].) Moreover, unlike in *Poway*, the City Council was aware of its own 1973 resolution allowing low density residences at the time of its relevant legislative acts in 2011, and the trial court was on notice of the 1973 amendment before it denied Orange Citizens' petition for writ of mandate.

Finally, because of the lengthy amount of time at issue in the instant case, it is less clear here what was made available to the public in the 1970's. Certainly, the evidence suggests the City's general plan as presented to the public at a recent point in time did not include a copy of the Planning Commission resolution setting forth the text of the amendment to the Orange Park Acres plan. But the record is silent as to what occurred in the 1970's. Moreover, section 65357, subdivision (b), which *Poway* cited in pointing out that the general plan amendment was not made available to the public, was only enacted in 1984. (Stats. 1984, ch. 1009, § 13.5 [adding public availability language]; Stats. 1985, ch. 338, § 1 [current form of § 65357].) Former section 65360, from which section 65357 was derived, did not include specific language providing for distribution to members of the public who requested copies of the general plan. (Stats. 1965, ch. 1880, §5.)

In sum, *Poway* suggests that courts should not overlook the objective manifestations of the general plan (i.e., "implementation") in favor of the subjective intent of the relevant legislative body in every case. But we reject the notion that *Poway* controls here. It was not arbitrary or capricious for the City Council to conclude that the

36

City's general plan in the 1970's included a designation of the Property as open space or low density residential, despite the lack of evidence of "implementation."

*The City Council Did Not Act Unreasonably in Concluding that the Orange Park Acres Plan Was Not Superseded by Subsequent General Plans*

Next, Orange Citizens contend that regardless of what the general plan was in the 1970's, the subsequent adoption of revised general plans in 1989 and 2010 with open space designations in the respective policy maps superseded the Orange Park Acres plan's amended text designation of the Property.

Relatedly, Orange Citizens complain that the judgment "permits public entities to have one general plan that they release to the public and a different general plan that they can trot out to help favored developers avoid a potential referendum." The process for adopting general plans and general plan amendments "would be meaningless if a city — or the courts — could simply declare that a city's 'real' general plan is not the plan the city actually circulated and approved, but includes other plans or policies that were not presented to the public as part of that general plan." Orange Citizens point to the distribution of the 2010 general plan for public review before its adoption and the presentation of the 2010 general plan as the City's general plan (e.g., on the City's website).

The essential issue is what the City Council intended in 1989 and 2010 in enacting the general plans. (See *Lesher*, *supra*, 52 Cal.3d at pp. 541-542 [reviewing voter initiative, holds that "dispositive question" in evaluating contents of general plan is voters' intent].) "Basic to all statutory construction . . . is ascertaining and implementing the intent of the adopting body. [Citations.] Absent ambiguity, we presume that the" adopting body intended the meaning on the face of an enactment "and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language." (*Id*. at p. 543 [analyzing voter initiative to determine whether it amended

37

general plan].)  When there is an ambiguity in a statute, courts refer to a variety of interpretive aids — including legislative history and purposes — to determine the legislative body's intent.  (*Southern California Cement Masons Joint Apprenticeship Committee v. California Apprenticeship Council* (2013) 213 Cal.App.4th 1531, 1545.)  Similarly, when there is ambiguity in the text of a local ordinance, those tasked with interpreting and applying it can look to these same interpretive aids.  (See *Bravo Vending v. City of Rancho Mirage* (1993) 16 Cal.App.4th 383, 407-408.)

Undoubtedly, the 1989 and/or 2010 general plans *could have* superseded the Orange Park Acres plan.  "Local agencies must periodically review and revise their general plans as circumstances warrant . . . ."  (*Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d at p. 572.)  If it is intended to do so, a revised general plan takes precedence over an older general plan.  (See, e.g., *Harroman*, *supra*, 235 Cal.App.3d at pp. 395-396 ["provisions of existing general plan under review" were suspended to ensure consistency with draft general plan].)  Had the 1989 or 2010 general plan plainly expressed the intent to eliminate the ongoing viability of the Orange Park Acres plan, we would not hesitate to characterize the City Council's actions as arbitrary and capricious.

But on the other hand, the Orange Park Acres plan could also have remained part of the City's general plan, as it was when adopted in 1973.  An inconsistent land use designation on the "General Plan Land Use Policy Map" does not necessarily entail a conclusion that a zone change ordinance is inconsistent with the general plan.  (*Las Virgenes Homeowners Federation, Inc. v. County of Los Angeles* (1986) 177 Cal.App.3d 300, 310.)  In *Las Virgenes*, the "General Plan Land Use Policy Map" designated the relevant real estate as "nonurban," which "calls for less than one dwelling unit per acre."  (*Ibid*.)  An area plan, considered part of the general plan for the portion of Los Angeles County at issue, designated the parcel as "residential, with two to four dwelling units per acre allowed."  (*Ibid*.)  The county's approval of the project was not

38

arbitrary or capricious because it was reasonable to conclude that the area plan served "to complete, extend and refine the General Plan land use policy, not contradict it." (*Id*. at p. 312.) *Las Virgenes* differs from the instant case in that the county's general plan explicitly stated that the policy maps were "general in character and are not to be interpreted literally or precisely" because of the vast areas shown. (*Id*. at p. 310.) Nonetheless, *Las Virgenes* demonstrates that the Policy Map is not the end of the analysis. (See also *Garat v. City of Riverside* (1991) 2 Cal.App.4th 259, 297, overruled on other grounds in *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743, fn. 11 ["ease of access to a plan (as opposed to whether it actually exists) is not a basis for attack under a mandate action"].)

It is unclear from the 1989 or 2010 general plans precisely what was intended with regard to the Orange Park Acres plan. There are contradictory references to the Orange Park Acres plan within these documents. Other resolutions by the City Council both before and after the adoption of the 1989 and 2010 general plans further muddied the waters. Given this uncertainty, we are unwilling to conclude that the City Council acted unreasonably by finding the 1989 and/or 2010 general plans were not intended to supersede the Orange Park Acres plan, and that the low density residential designation therefore survived the adoption of the 1989 and 2010 general plans.

The slippery slope alluded to by Orange Citizens (i.e., municipalities could in bad faith retain hidden general plan documents to use when favored developers sought special treatment) does not concern us, as it has little to do with this case. It is not as if the City Council invented an alternate general plan out of whole cloth. There is no evidence of bad faith. Instead, the most reasonable inference from the record is that a seemingly insignificant (at the time) error of omission by City planning employees in the early 1970's reared its ugly head 30 years later.

*The Alleged Internal Inconsistency of the General Plan Does Not Mean the City Council Acted Unreasonably in Approving the Project*

As its fallback position, Orange Citizens claim that if the Orange Park Acres plan is still part of the general plan, the City's general plan is internally inconsistent and cannot provide the basis for approval of the Project. Clearly, the Policy Map is not the same as the Orange Park Acres plan designation for the Property. And in its attempted adoption of the General Plan Amendment and in the other 2011 resolutions and ordinances approving the Project, the City Council admitted to at least some lack of clarity in its general plan.

"If a general plan is to fulfill its function as a 'constitution' guiding 'an effective planning process,' a general plan must be reasonably consistent and integrated on its face. A document that, on its face, displays substantial contradictions and inconsistencies cannot serve as an effective plan because those subject to the plan cannot tell what is says should happen or not happen. When a court rules a facially inconsistent plan unlawful and requires a local agency to adopt a consistent plan, the court is not evaluating the merits of the plan; rather, the court is simply directing the local agency to state with reasonable clarity what its plan is." (*Concerned Citizens of Calaveras County v. Board of Supervisors* (1985) 166 Cal.App.3d 90, 97 (*Calaveras*); *id*. at pp. 94-95, 103 [case in which adoption of general plan was challenged because land use element called for large population growth while circulation element did not address how to pay for additional circulation infrastructure other than lobbying the state for additional funds].)

If it is determined that a facially inconsistent general plan was adopted, the remedy is the issuance of a writ of mandate directing the legislative body to set aside its adoption of deficient elements and to adopt legally sufficient elements. (*Calaveras*, *supra*, 166 Cal.App.3d at p. 105.) Of course, Orange Citizens are not asking this court to order the City Council to set aside its adoption of the 2010 general plan and clarify the land use element with regard to use of the Property. The City Council already attempted

40

to clarify the contents of its general plan via the General Plan Amendment, which was nullified via referendum. Instead, Orange Citizens assert that the internal inconsistency of the City's general plan precludes approval of the Project via the zone change and development agreement.

In support of its argument, Orange Citizens cite *Sierra Club v. Board of Supervisors* (1981) 126 Cal.App.3d 698 (*Sierra Club*). There, the general plan was deemed to be internally inconsistent because its land use and open space elements (including relevant maps) designated the same property for different uses. (*Id*. at p. 703.) Despite an awareness of inconsistencies in the two elements at the time the general plan was adopted, planning officials opted not to harmonize the elements by actually considering the best use for each geographical area. Instead, the planning agency inserted a "precedence clause" in the general plan, which provided that in case of conflict between the land use and open space elements, the land use element designation had precedence. (*Ibid*.)

Sierra Club's challenge to a zoning change necessary for a particular project was moot because, during the course of the litigation, the legislative body amended the general plan to explicitly reconcile the land use and open space elements applicable to the affected geographical region. (*Sierra Club*, *supra*, 126 Cal.App.3d at p. 704-705.) The appellate court nevertheless found the precedence clause (which was still applicable to much of the county's general plan) to violate the purpose of the Open Space Lands Act (§ 65560 et seq): "The legislative intent . . . [citation] is frustrated if counties can simply subordinate the open space element to other elements of the general plan." (*Sierra Club*, *supra*, 126 Cal.App.3d at p. 704.) With the precedence clause invalidated, the court deemed the general plan to be internally inconsistent and concluded that (were the issue not moot) the zoning ordinance under review "could not be consistent with such plan [citation] and was invalid when passed." (*Ibid*.)

41

*Sierra Club* is inapplicable to the facts before us. The *Sierra Club* court was concerned with planning agencies intentionally avoiding their obligation to "adopt a comprehensive, long-term general plan" (§ 65300) with all seven required elements (§ 65302). The Legislature intended that "the general plan and elements and parts thereof comprise an integrated, internally consistent and compatible statement of policies for the adopting agency." (§ 65300.5.) By simply inserting a precedence clause into its general plan, the county partially abdicated its obligation to prepare a general plan.

Here, the City unintentionally allowed a single ambiguity to creep into its general plan. When the ambiguity was discovered, the City Council analyzed the situation and concluded that a classification of the Property as solely open space was inaccurate and not in keeping with its intent. The City Council attempted to remove the erroneous information from the general plan. That the erroneous information remains in the Policy Map because of the referendum does not alter the reasonableness of the City Council's conclusion that the open space designation is an error and not a substantive inconsistency like that present in *Calaveras* and *Sierra Club*.

*The Merits: Validity of Referendum Voiding General Plan Amendment*

By staying the trial court's writ of mandate, we allowed an election to proceed on the question of whether the modifications proposed in the General Plan Amendment should be incorporated into the City's general plan. The voters of the City said no. Orange Citizens state in their opening brief that the court erred by issuing a writ of mandate to the City to "[r]escind Resolutions 10580 and 10581 and remove the referendum regarding the General Plan Amendment from the November 6, 2012 election ballot." Neither Milan nor the City defend this part of the court's judgment in their briefs. Moreover, the question of allowing the referendum to proceed is moot. We also note it would be contradictory to find that the Project is consistent with the general plan (without the General Plan Amendment), but that the nullification of the General Plan

42

Amendment by referendum created unacceptable inconsistency in the general plan. We therefore agree with Orange Citizens that the judgment should be reversed in part.

Milan and the City ignore the question of the validity of the referendum and instead argue that the General Plan Amendment was simply unnecessary for approval of the Project. As discussed above, we agree. In 1973, the City Council adopted the Orange Park Acres plan as part of the general plan, and in doing so designated the Property as open space or low density residential. In 1977, the City Council resolved to remove any language in the Orange Park Acres plan inaccurately suggesting it was a specific plan. In 2011, the City Council repeatedly found the Orange Park Acres plan was still part of the general plan and the Property's use designation still allowed low density residential development. The City may fix errors in the Orange Park Acres Plan and the Policy Map by reference to previously adopted resolutions of the City Council. The General Plan Amendment was nullified by the voters, but it does not matter with regard to the major points of contention.

None of the parties specifically address the portion of the judgment ordering the issuance of a writ of mandate that commands the City to "[p]ermit Milan to develop the . . . Property in accordance with the actual and original General Plan designation of the property as 'Other Open Space and Low Density (1 Acre)' and the Development Agreement, and all other applicable requirements of the City." It is unclear why this relief was strictly necessary, but the City does not object in its brief to allowing this portion of the judgment to remain in force. We therefore affirm this portion of the judgment.

DISPOSITION

The judgment is affirmed in part and reversed in part. We reverse the judgment in favor of Milan on its second cause of action for writ of mandate (which had

43

challenged placement of the referendum on the ballot), the fifth cause of action for declaratory relief (which had sought a declaration of invalidity of the referendum), and the portion of the judgment ordering the issuance of a writ of mandate rescinding the City's resolutions Nos. 10580 and 10581 (which had placed the referendum on the ballot). The judgment is otherwise affirmed. Orange Citizens' petition for writ of mandate is denied. Orange Citizens' request and supplemental request for judicial notice are granted. Our July 12, 2012 stay order is lifted. In the interests of justice, the parties shall bear their own costs on appeal.


                                        IKOLA, J.

WE CONCUR:


O'LEARY, P. J.


RYLAARSDAM, J.


44